[661 NYS2d 620]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v STEVEN WEISMAN, Respondent.

First Department, August 7, 1997

## APPEARANCES OF COUNSEL

*Alan N. Buonpastore* ·of counsel *(Donald J. Siewert* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for appellant.

*Ronald Cohen* of counsel *(Stephen C. Cooper,* attorney), for respondent.

## OPINION OF THE COURT

MILONAS, J. P.

In October 1994, defendant, an attorney, represented GMAC Mortgage of Pennsylvania (GMAC) at a closing in connection with the purchase of a Manhattan condominium by Raphael Pantoja from the Kiska Construction Company. At the closing, defendant presented GMAC's check in the amount of $352,829.56 to First Atlantic Bank (Atlantic), the holder of the seller's mortgage. Atlantic issued mortgage releases to First American Title Company (FATCO), which was to file them and record the GMAC mortgage. Following the closing, however, the seller discovered that Pantoja had used forged certified checks to make the purchase. It was agreed that Atlantic would return GMAC's money to FATCO, which in turn would return the money to GMAC. The seller brought an action in New York County Supreme Court to rescind the sale, and the New York County District Attorney's Office began an investigation into the matter, which resulted in Pantoja's indictment for grand larceny and related crimes.

In February 1995, defendant testified before the Grand Jury looking into Pantoja's dealings. His testimony concerned the documents offered and signed by Pantoja at the closing. At the conclusion of his testimony, the prosecutor asked what happened to the money GMAC had lent to Pantoja. Defendant responded that after the money had "cleared" First Atlantic Bank, he received a telephone call from the seller's attorney, Mr. Dogan, who informed him that Pantoja's checks had bounced. Defendant was then asked "[w]hat happened after that phone conversation?"

"A. Mr. Dogan told me to, that he was commencing an action in State Supreme Court to have the deal rescinded based

upon fraud, that I would be getting a copy of his papers. About two weeks later I received some papers. I was asked to submit an affidavit. And the case is still pending.

"Q. What happened with regard to GMAC's money?

"A. Atlantic Bank, after about a month of back and forth, was required to send the money back to GMAC.

"Q. And did it do so?

"A. Yes."

The next and final question was whether defendant ever spoke with Pantoja or his attorney again, to which he responded "never."

Apparently, what actually transpired with respect to the mortgage funds is that when Atlantic returned GMAC's money to FATCO, the latter sent a check for $352,829.56 to defendant, payable to him "as attorney for GMAC." Upon defendant's demand for a certified check, FATCO complied, whereupon defendant endorsed the certified check and deposited it into his IOLA account. According to the People, he never returned the funds to GMAC.

In August 1995, a GMAC supervisor discovered that the mortgage on Pantoja's condominium had never been recorded. According to the prosecution, a call to defendant regarding this omission led to the discovery that defendant had stolen the funds that should have been returned to GMAC; that he had tried to cover up the theft by producing falsified bank statements as well as a check with which he had purportedly repaid the funds to GMAC; and that he had forged the signature of a GMAC loan officer (alleged in the affidavit to be a vice-president) on the affidavit submitted to the Judge in the civil action, in which it was stated that the mortgage loan had been returned to GMAC after Pantoja's fraud came to light.

By indictment filed in December 1995, defendant was charged with grand larceny in the second degree for the theft of the money, and forgery in the second degree, making an apparently sworn false statement and offering a false instrument for filing in the first degree in connection with the falsified bank statements and affidavit.

Based on his testimony before the Pantoja Grand Jury, defendant claimed he had immunity from prosecution for the crimes charged and moved to dismiss the indictment. The People agreed to the dismissal of count two on other grounds, and the court dismissed counts one, four, five and six, finding that the testimony cited above had conferred transactional im-

munity upon defendant for the charges so dismissed. Only count three survived, relating to the bank statement allegedly forged after defendant had testified before the Grand Jury, on the ground that defendant's testimony could not be said to relate to a crime that, at the time the testimony was given, had not been committed.

CPL 190.40 (2) provides that, with certain exceptions not relevant here, "[a] witness who gives evidence in a grand jury proceeding receives immunity." CPL 50.10 (1) defines "immunity" as follows: "A person who has been a witness in a legal proceeding, and who cannot, except as otherwise provided in this subdivision, be convicted of any offense or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he gave evidence therein, possesses 'immunity' from any such conviction, penalty or forfeiture."

The question before us is whether the testimony cited above, given in the Pantoja Grand Jury, constitutes "evidence" concerning the "transaction, matter or thing" for which defendant was subsequently indicted. Other courts have observed that the transactional immunity conferred under this statute is so broad that the prosecution, in calling witnesses before a Grand Jury, must proceed with caution, lest it unintentionally bestow such immunity upon a witness for "any transaction concerning which he gave testimony" (*see, e.g., Matter of Carey v Kitson*, 93 AD2d 50, 64, *lv denied* 60 NY2d 553; *People v Williams*, 81 AD2d 418, *affd on decision below* 56 NY2d 916). The prosecutor may be entirely unsuspecting of any wrongdoing on the witness's part with respect to the crime under investigation or any other crime; it is the mere giving of the testimony, so long as it is responsive to the inquiry (CPL 190.40 [2] [b]), that confers immunity.

In dismissing the counts herein, the court was troubled that defendant's brief testimony in response to "innocuous" questions posed by an unsuspecting prosecutor resulted in defendant's insulation from prosecution. Indeed, the court urged the Legislature to revisit the immunity statutes of this State, observing that the facts of the instant case "dramatically illustrate" that the scope of the statute is "excessive," resulting in the "automatic bestowal" of immunity with "unforeseeable and unfortunate consequences."

However broad the statute's scope, the test as to whether immunity has in fact been conferred is generally recognized to be whether " 'there is a reasonable possibility of prosecution, and

that the testimony, though falling short of proving the crime in its entirety, will prove some part or feature of it, will *tend* to a conviction when combined with proof of other circumstances which others may supply' " (*People v Williams, supra,* at 424, quoting *Matter of Doyle,* 257 NY 244, 256). *Williams* notes, however, that while some cases point to whether the testimony at issue is a "link in the chain of facts against the witness," thereby conferring immunity, it is, fundamentally, "the context of the circumstances which ultimately governs" (*id.,* at 424-425).

In view of the context of the circumstances presented in the instant case, we find that defendant's testimony did not confer such immunity, and he may therefore be prosecuted for the crimes charged in counts one, four, five and six of the indictment.

Defendant's passing comment that he had been asked to submit an affidavit in the civil suit (which, we note parenthetically, was not particularly responsive to the question posed) and his one-word acknowledgement that Atlantic Bank had returned the money to GMAC, do not "link" him to the crimes with which he was charged (theft and forgery), nor may they fairly be said to prove some part of the crimes or "tend to a conviction" in conjunction with other proof. While the testimony given need not constitute a virtual confession, or be of any particular quantity, the connection between it and the crime(s) charged still must be "real and of some substantiality, not merely trifling, imaginary or speculative" (*Matter of Gelinas v Barrett,* 147 AD2d 293, 295).

For example, in *People v Petgen* (92 AD2d 693), defendant and his son killed John Marmo, but defendant did not receive immunity when, in a Grand Jury investigating a different murder, he testified that he knew Marmo had been shot and that Marmo's truck was parked in front of defendant's house the morning of his death. According to the Third Department, such testimony "plainly did not tend to incriminate defendant" in Marmo's death (*id.,* at 694). In *Gelinas (supra)* testimony about drug activity sometime prior to a homicide, given before a Grand Jury investigating the homicide, did not confer immunity on defendant for an undercover drug sale made subsequent to the homicide.

In the instant case, defendant did not testify about the "transaction, matter or thing" that formed the basis of the indictment against him. There is nothing directly incriminatory about the testimony he did give, nor do the few lines in

question lend themselves to reasonable inferences that are incriminatory (*see, People v Williams, supra*). While the motion court relied on *Williams* in dismissing the four counts, the nature of the testimony in that case is markedly different from the testimony before us. Williams' Grand Jury testimony included a detailed account of his encounter with the victim on the day she was murdered. The Second Department concluded that this testimony, while implicating the then-suspect, was also susceptible of reasonable inferences implicating defendant himself (*see also, People v Dittus*, 114 AD2d 277, 279).

Defendant, in maintaining that he testified about the actual transactions giving rise to the indictment, mischaracterizes the testimony he gave in the Grand Jury. He claims that he testified that he "received back and returned" to GMAC the money at issue and that he in fact supplied an affidavit in the civil action. As is readily apparent from the testimony set forth in full above, defendant never testified to such "facts." In the brief testimony at issue, defendant did not admit or ascribe to himself any role in Atlantic's return of the funds, nor did he affirmatively represent that he ever complied with the request for an affidavit in any respect. Indeed, in misdescribing his testimony, he contrasts *Petgen* and *Gelinas*, where testimony merely indicating knowledge of or mentioning the event in question was held insufficient to confer immunity under the statute. At most, this is all that can be said of his own testimony in the Grand Jury here. Therefore, defendant did not acquire immunity for the crimes charged, and the four counts should not have been dismissed.

Accordingly, the order of the Supreme Court, New York County (Rena Uviller, J.), entered April 24, 1996, which dismissed four counts of the indictment, should be reversed, on the law, the motion to dismiss denied, and counts one, four, five and six reinstated.

ELLERIN, NARDELLI and WILLIAMS, JJ., concur.

Order, Supreme Court, New York County, entered on or about April 24, 1996, reversed, on the law, defendant's motion to dismiss denied, and counts one, four, five and six reinstated.