[671 NYS2d 13]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PATRICIA FEERICK, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MAYRA SCHULTZ, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN DEVITO, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ORLANDO ROSARIO, Appellant.

First Department, March 24, 1998

## APPEARANCES OF COUNSEL

*Sylvia Wertheimer* of counsel *(Mark Dwyer* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

*Roger Bennet Adler* of counsel *(Karen Bennett* on the brief; *Roger Bennet Adler, P. C.,* attorneys), for Patricia Feerick; and *Mark M. Baker* and *Benjamin Brafman* of counsel *(Dalit Yarden* on the brief; *Brafman, Gilbert & Ross, P. C.,* attorneys), for Patricia Feerick and another, appellants.

*Richard E. Mischel* for Mayra Schultz, appellant.

*Raymond E. Kerno* for John DeVito, appellant.

*Richard A. Dienst* and *Leslie H. Ben-Zvi* of counsel *(Dienst & Serrins,* attorneys), for New York City Police Department and others, *amici curiae.*

## OPINION OF THE COURT

Per Curiam.

In a 30-count indictment, Police Lieutenant Feerick and Police Officers DeVito, Rosario and Schultz of the 25th Precinct were charged with various crimes arising out of their conduct on September 26, 1990, in connection with their search for a lost police radio belonging to DeVito. On the morning of September 26th, defendants went to an apartment building in the Taino Tower complex in upper Manhattan to pursue a lead regarding the radio, which had been lost during a drug arrest in the area several days earlier. Defendants pushed their way into two apartments, ransacking both and, with weapons drawn, unlawfully detained the individuals encountered within (Denise Jackson, Theresa Johnson, Maribel Delgado and Ben

Stokes). Defendants threatened them with arrest and other punitive repercussions if they did not cooperate in helping to find the radio. In searching the second apartment, where they encountered Stokes, defendants discovered 591 vials of crack cocaine in a paper bag; Feerick said they would "forget" about the crack if the radio were returned. Jackson was further threatened that large quantities of drugs would be "found" in her apartment if the radio were not promptly returned.

Upon returning to the precinct that afternoon, Officer DeVito vouchered the 591 crack vials and, in completing various forms, indicated that the drugs had been recovered in an alleyway behind the building, where he saw Ben Stokes drop them and flee, eluding apprehension. Late that same night, the lost radio was turned over to security personnel at the building complex by an unidentified individual and returned to the police.

Sometime after defendants left the building, Denise Jackson called 911 to report the incident, and Detective Miller of the Internal Affairs Division (IAD) began an investigation. He visited Jackson's apartment late that afternoon and photographed the damage evident throughout, including a message scrawled across one wall, "We want the radio." Jackson, Johnson, Delgado and Stokes, as well as members of building security, were interviewed, and the identity of the four officers was quickly ascertained; their memo books were seized and other relevant police records obtained. While Delgado was somewhat reluctant to become involved in the matter, Stokes, who gave Miller an account of what had transpired that day, was completely unwilling to cooperate in any criminal prosecution.

A newly formed unit of the Manhattan District Attorney's office, the Official Corruption Unit, headed by Assistant District Attorney (ADA) Stephens, was kept apprised of developments in the investigation, but by early January 1991, ADA Stephens decided not to pursue criminal charges against defendants. Although he believed the allegations and considered them to be serious, he had "philosophical" reservations about the new unit pursuing the matter. Stokes's unwillingness to cooperate was only a minor factor in his decision.

By letter dated January 7, 1991, he informed the Police Department of his decision, detailing the evidence accumulated against the defendants and urging that the Department pursue the appropriate disciplinary action against them. In light of this decision, the Police Department commenced administrative proceedings against the defendants by conducting hear-

ings pursuant to Patrol Guide (PG) section 118-9; at such hearings (also referred to as "GO 15s"), an officer is compelled to answer questions under penalty of dismissal. On January 17, 1991, a PG 118-9 hearing was held for Feerick; on January 18, 1991, a hearing was conducted for Rosario. Hearings for DeVito and Schultz were conducted on January 24th. Feerick was questioned a second time on March 27th about related events, but not about her actions on September 26th.

Each defendant was represented by counsel, and each gave essentially the same statement, denying any wrongdoing. They claimed that they had canvassed the building in question in search of leads to recover the lost radio; that they encountered Jackson and Johnson only, in Jackson's apartment; and that they saw Stokes only in the alleyway when he dropped the drugs. In the course of Rosario's PG 118-9 hearing, he disclosed that he had arrested Stokes on January 5, 1991, for possession of those drugs. (Without advising the narcotics prosecutor of the investigation into the events of September 26th, Rosario proceeded to testify in the Grand Jury on January 11th regarding that arrest.)

Sometime after his arraignment on these drug possession charges, Stokes contacted Delgado for Detective Miller's number; Stokes was angry that defendants had not kept their part of the "bargain" that they would "forget" about the crack if the radio were returned. Stokes tried to reach Miller on January 18th, but Miller had left for the day. When Miller arrived at work on January 21st, having been off the previous two days, he found a message that Stokes had called on the 18th and would call again. He also found on his desk a copy of an arrest report relating to Stokes's January 5th arrest, which apparently had been faxed to the IAD office sometime on January 18th. Stokes did call Miller later on the morning of the 21st from the hospital prison ward where he was incarcerated on the drug charges, complaining about his arrest and advising Miller that he was now ready to cooperate in the investigation.

Later that week, after Miller had spoken to Stokes several times, the District Attorney's office was apprised of Stokes's status. Its investigation was reopened and, ultimately, testimony was presented to a Grand Jury, resulting in the instant indictment in March 1992. Following a jury trial, each defendant was found guilty of four counts of unlawful imprisonment in the second degree; one count of coercion in the second degree; one count of criminal trespass in the second degree (except two counts as to Feerick); and one count of official

misconduct (except two counts as to Feerick and DeVito). Rosario was also convicted of perjury in the first degree, and DeVito was convicted of falsifying business records in the first degree. Prior to sentencing, defendants moved pursuant to CPL 330.30 to set aside the verdict, alleging improper use of their PG 118-9 statements in connection with the indictment and trial, as well as various *Rosario* violations. The trial court denied the motion, with leave to renew postjudgment. Thereafter, defendants' motion pursuant to CPL 440.10 to vacate the judgment on the same grounds was denied on January 10, 1995. Defendants' appeal from that denial was consolidated with their direct appeal.

By order of this Court entered August 29, 1996 (230 AD2d 689), the appeals from their judgments of conviction were held in abeyance, in order for the *Kastigar* hearing court to determine if certain documents constituted *Rosario* material and, if necessary, take additional evidence and make a de novo *Kastigar* ruling. By that order, we also reversed the denial of the CPL 440.10 motion, the same *Kastigar/Rosario* claim having been raised therein. The matter having now been returned to us with a de novo ruling, and the parties having submitted supplemental briefs and further written argument, we turn to the substance of defendants' claims.

■ Among the numerous issues raised on this appeal, defendants challenge the sufficiency of the trial evidence, the court's charge on unlawful imprisonment, alleged inconsistencies in the jury verdict and the court's restriction on cross-examination of certain witnesses. We find that the evidence was more than sufficient to sustain the jury's verdicts of guilt, that all the elements of the crimes charged were established and that the guilty verdicts as to certain counts and not guilty verdicts as to others are not inconsistent with one another. Cross-examination regarding Jackson's drug use was not improperly limited by the court, and any error in the charge on unlawful imprisonment was harmless under the circumstances, given the absence of any evidence to support defendants' claim that their conduct in restraining the apartments' occupants was prompted by legitimate safety concerns.

In sum, while defendants continue to claim that, at worst, their conduct constituted no more than an impermissible search for which there is no criminal liability, and that to uphold the guilty verdicts would be to seriously "chill" the ability and good-faith efforts of law enforcement to protect the public, the evidence before the jury amply demonstrated that

defendants far exceeded the bounds of permissible police conduct and that they committed the crimes of which they were found guilty.

 Defendants also claim that various *Kastigar* and *Rosario* violations require reversal and dismissal of the indictment. First, they claim that the police and the prosecution made use of their PG 118-9 hearing testimony both for purposes of obtaining an indictment and at trial. Indeed, the defense goes so far as to allege the existence of a "concerted effort" and an "agreement" between the prosecution and police to violate defendants' *Kastigar* rights.

It is well established that because, as previously noted, testimony at a PG 118-9 hearing is compulsory, such testimony may not be used against an officer in any subsequent criminal proceeding, i.e., neither the substance of the statement nor anything derived from that statement (such as the existence of other evidence or the identity of witnesses) may be used (*Kastigar v United States*, 406 US 441; *People v Corrigan*, 80 NY2d 326). The burden upon the prosecution is a heavy one to demonstrate that the evidence upon which it relied was derived from sources entirely independent of defendants' immunized statements. Mere denial is insufficient; the prosecution must affirmatively show how it acquired the evidence (*United States v Montoya*, 45 F3d 1286, 1292, *cert denied* 516 US 814). With respect to the indictment before us, as the hearing court has now twice concluded, and we agree, the prosecution met that burden.

A *Kastigar* hearing was conducted, at which the prosecution called Detective Miller, and the defense called ADA Stephens, Lieutenant Foley (Miller's supervisor) and Deputy Inspector DeMartini (Miller's commanding officer). The court also had in its possession transcripts of the PG 118-9 hearings (neither the transcripts nor the tapes of these hearings were turned over to the prosecution at the hearing). By written decision dated August 6, 1993, the hearing court first rejected outright the notion of a "conspiracy" between the District Attorney's office and IAD to violate defendants' *Kastigar* rights. The court proceeded to review the evidence and concluded that the prosecution was well aware of the relevant information in defendants' statements, with the exception of Rosario's reference to Stokes's January 5th arrest, long before the hearings were conducted. Indeed, as the court noted, ADA Stephens's letter of January 7, 1991 provided a detailed account of the substantial evidence in the possession of the prosecution and IAD not long after the

events in question and prior to the hearings. Thus, as to virtually all the evidence, the People satisfied their burden by establishing that it was in their possession *prior* to the administrative hearings (*People v Grim*, 166 AD2d 264, *lv denied* 76 NY2d 986, *cert denied sub nom. Goodacre v New York,* 499 US 976).

With respect to the fact of Stokes's arrest, despite defendants' insistence that the source of this information was Rosario's PG 118-9 hearing testimony, the prosecution established an independent source for this information as well, namely, the phone calls Stokes made to Detective Miller while incarcerated on January 18th and 21st, complaining of his arrest and volunteering his cooperation. As a general matter, the prosecution also established that Miller and his superiors were aware that the criminal and administrative proceedings must be kept entirely separate; that Miller did not look at the documents generated by those proceedings, which were kept in the desk drawer of his superior officer, Lieutenant Foley; and that no one discussed those proceedings with him. Thus, the record supports the hearing court's conclusion that no *Kastigar* violation occurred in securing the indictment.

Pursuant to our order remanding the matter, the hearing court inspected numerous police documents in camera and turned over six to defense counsel as *Rosario* material. Having heard further testimony in connection with that material, and extended legal argument, the court also reviewed the original transcript and all *Kastigar*-related material. In a de novo ruling dated February 3, 1997, the court again concluded that neither the prosecution nor the police had made prohibited use of the immunized testimony to secure the indictment. This conclusion was fully supported by the credible evidence before the court, and we find no error in the manner in which the court conducted this hearing. In this regard, we note that the hearing was conducted not only in accordance with our previous order but also with the request, as expressed by one defendant's brief, that the *Kastigar* hearing "at the very least, should be re-opened." Moreover, in defendants' motion for clarification of our remand order (seeking two separate hearings), the reopening of the *Kastigar* hearing, as directed in that order, was not challenged.

In sum, despite defendants' protracted arguments to the contrary, the record before us amply establishes that shortly after the events in question, the prosecution and police possessed almost all of the evidence ultimately used against defendants,

with few exceptions. As to those, the prosecution more than adequately demonstrated an independent source as well.

We note that an indictment is not fatally tainted merely because someone involved in the criminal prosecution may have been exposed to a portion or all of a defendant's immunized statement, although clearly precautions should be taken—and stringently observed—to prevent such occurrence. For example, in *People v Corrigan* (80 NY2d 326, *supra),* dismissal of criminal charges against a police officer was not warranted solely because when the officer testified in the Grand Jury, the prosecutor had in his possession a copy of the officer's immunized administrative hearing statement. In that case, the Court of Appeals observed that there was no evidence that defendant was in any way affected or prejudiced, or indeed that he knew the prosecutor had the statement; there was also "ample evidence" in the record "to sustain the charges independent of anything that could be attributed to the immunized statement." *(Supra,* at 331.) The Court cautioned, however, that "the practice should be avoided" (*supra,* at 332).

The result in *Corrigan* does not in any way lighten the burden on the prosecution. It does, however, serve as a reminder of the nature of a *Kastigar* inquiry: whether the prosecution made any *use* whatsoever of a defendant's immunized testimony, not whether it had access to it. As the hearing court correctly concluded, the answer to that inquiry in the case before us is no.

With respect to the issue of *Kastigar* violations in connection with the trial, defendants' CPL 440.10 motion was properly denied. First, as the trial court noted in its decision, with respect to the alleged discovery of certain witnesses through the PG 118-9 testimony, defendants failed to raise a *Kastigar* claim when those witnesses testified at trial for the prosecution. The claim is thus unpreserved for review (*see, People v Padro,* 75 NY2d 820). In any event, the trial court correctly concluded that the prosecution, through its responding affidavits, had demonstrated an independent source for the identity of the two witnesses. Indeed, the source was defendants' pleadings in their unsuccessful lawsuits against the prosecutors (and others) to enjoin their trial on the instant indictment (*Matter of Feerick v Sudolnik,* 186 AD2d 1097, *lv denied* 81 NY2d 702; *Feerick v Sudolnik,* 816 F Supp 879 [SD NY], *affd* 2 F3d 403). Defendants' remaining claims with respect to *Kastigar* violations at trial are similarly unpreserved and without merit. We further note that, contrary to defendants' argument, an eviden-

tiary hearing is not required in order to satisfy the prosecution's burden; in certain circumstances, such as here, where court documents constitute the independent source, the submission of affidavits may suffice (*see, United States v Montoya, supra*).

We turn to defendants' final joint claim that the prosecution's failure to turn over *Rosario* material at trial requires reversal. This claim relates to numerous reports generated by Detective Miller in the course of his investigation. At the *Kastigar* hearing, defendants were given an index listing all the reports relevant to the investigation (144 in number), and indicating their date and subject matter. Counsel's request for the entire file as *Rosario* material for purposes of the hearing was properly denied by the hearing court, since the People's obligation is to turn over only material relating to the witness's direct testimony (*see, e.g., People v Barclift*, 228 AD2d 194, 195, *lv denied* 88 NY2d 980; *People v Stern*, 226 AD2d 238, 239-240, *lv denied* 88 NY2d 969; *People v Melendez*, 178 AD2d 366, 367, *lv denied* 79 NY2d 950); even material bearing on the witness's credibility must relate to the witness's direct testimony in order to qualify as *Rosario* material (*People v Stern, supra*). Thus, for purposes of the hearing, which had a particular, narrow focus, only certain of Miller's worksheets were turned over to defendants. Subsequently, additional material was provided to the defense in connection with a *Wade* hearing and then at trial. When the material was noted for the record at trial, the defense questioned only why a particular document had not been turned over at the *Kastigar* hearing. Later, in the context of a defense argument about redactions the prosecution had made on certain *Rosario* material, the People responded that they were aware of and had met their *Rosario* obligations.

Following trial, defendants claimed in their CPL 440.10 motion that they had not been given all existing *Rosario* material; they now further specifically claim that at least three of the worksheets turned over as a result of this Court's August 29, 1996 remand order constituted trial *Rosario* material. In response, the People contend that defendants have not preserved the issue for appellate review, and that, in any event, of the three documents cited in defendants' supplemental brief, one had been turned over at trial, and the other two are not *Rosario* material. Under the particular circumstances before us, we are persuaded that defendants have indeed failed to preserve this claim for review.

It is unquestionably the People's burden to locate and produce *Rosario* material (*see, e.g., People v Ranghelle*, 69 NY2d

56, 64), and "defense efforts, or lack thereof, are irrelevant on the issue of the prosecutor's affirmative obligation" to do so (*People v Ramos*, 201 AD2d 78, 86). Nevertheless, there are circumstances under which a defendant will be held to have waived a *Rosario* claim (*People v Graves*, 85 NY2d 1024; *People v Rogelio*, 79 NY2d 843; *People v Tamayo*, 222 AD2d 321, *lv denied* 88 NY2d 886). This is true where the existence of such material is known to the defense, but is not specifically requested and no relief is sought from the court for its nonproduction (*People v Graves, supra; People v Rogelio, supra*), or where the defense raises a particular objection, the issue is deferred by the court and defendant fails to raise it again (*see, e.g., People v Spencer*, 219 AD2d 259, 265, *lv denied* 88 NY2d 1024). As we have previously observed, the purpose of the *Rosario* rule is to "protect counsel who would ordinarily have no knowledge of the material and no other means of obtaining it (*see, People v Jones*, 70 NY2d 547, 550, 552). Once the existence of *Rosario* material is disclosed in open court, it behooves counsel to seek sanctions for belated disclosure or nonproduction, or else the claim for violation is deemed abandoned (*People v Graves*, 85 NY2d 1024)" (*People v Tamayo*, 222 AD2d 321, 322, *lv denied* 88 NY2d 886, *supra*).

In the instant case, defendants' demand for Miller's entire file at the *Kastigar* hearing does not "carry over" to the trial proceedings for purposes of raising or preserving the claim (*see, People v Ward*, 241 AD2d 767, 770, *lv denied* 91 NY2d 837). The issues at a pretrial hearing are not necessarily identical to those at trial; therefore, what constitutes *Rosario* material in connection with a witness's direct testimony at such hearing may well differ from what constitutes *Rosario* material for trial purposes. In addition, as was the case here, such proceedings are not even necessarily conducted by the same Justice. Thus, whatever is requested or provided at a pretrial proceeding is not dispositive of what may be requested or provided, or necessary to provide, at any subsequent proceeding.

More important, as the trial court noted in denying the CPL 440.10 motion, from the time of the *Kastigar* hearing, the defense was in possession of a list of the contents of Miller's file, detailing not only the actual number of reports but also their subject matter. It is precisely because defendants were in possession of this index—a list of 144 "potential" *Rosario* items—that their failure to seek additional items or request sanctions for nonproduction of any item on that index must be

viewed as a failure to preserve their present claim. Moreover, given the general tone that permeates the voluminous transcripts and substantial briefs generated in this case, defendants can hardly maintain in this Court that, to quote the language of one brief, they were "lulled" into believing that they had received all existing *Rosario* material by the prosecutor's say-so.

■ A further claim is raised by defendant Rosario alone. He contends that when he testified in the Grand Jury concerning Stokes's possession of drugs in the alleyway on September 26th, he acquired transactional immunity for crimes arising out of his (Rosario's) conduct inside the apartment complex that day. His pretrial motion to dismiss the charges on this ground was denied. The motion court concluded that, despite the broad scope of immunity conferred by New York State statutes, they were not intended to confer immunity on a police officer who "effects a false arrest, initiates a grand jury proceeding and then gives completely untruthful testimony."

The relevant statutes are CPL 190.40 (2), which provides that "[a] witness who gives evidence in a grand jury proceeding receives immunity," and CPL 50.10 (1), which provides the following definition of "immunity": "A person who has been a witness in a legal proceeding, and who cannot, except as otherwise provided in this subdivision, be convicted of any offense or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he gave evidence therein, possesses 'immunity' from any such conviction, penalty or forfeiture." The same subdivision also provides that a witness who acquires such immunity "may nevertheless be convicted of perjury as a result of having given false testimony in such legal proceeding." Thus, the immunity claimed by Rosario would not extend to the perjury charges of which he was also found guilty.

Pursuant to these statutes, the relevant inquiry is whether Rosario's testimony that he saw Stokes drop the drugs in the alleyway constitutes "evidence" concerning the "transaction, matter or thing" for which Rosario was later indicted, i.e., his conduct inside Jackson's apartment. (He was acquitted of crimes committed in the second apartment, where Stokes and the drugs were actually found.) In scrutinizing the testimony given, the test has been recognized to be whether " 'there is a reasonable possibility of prosecution, and that the testimony, though falling short of proving the crime in its entirety, will prove some part or feature of it, will *tend* to a conviction when

combined with proof of other circumstances which others may supply' (*Matter of Doyle*, 257 NY 244, 256, *supra*)." (*People v Williams*, 81 AD2d 418, 424, *affd on opn below* 56 NY2d 916.) According to *Williams*, in order to determine if the test has been met, it is "the context of the circumstances which ultimately governs" (*supra*, at 425), and the Court of Appeals has more recently observed that a witness acquires "full transactional immunity for any topic discussed by the witness within the scope of the proceeding" (*People v Chin*, 67 NY2d 22, 33, n 4).

We note at the outset that, in applying these standards, the good faith or ignorance on the part of the prosecutor is irrelevant; the fact that the prosecutor handling the drug case had no idea that the crimes with which Rosario was later charged had even been committed, and that, due to Rosario's silence about the pending investigations, the prosecutor had no reason to suspect his story or have reservations about anything he might say in the Grand Jury, have no bearing on the immunity issue. Nor is the brevity of the testimony here relevant, since it is the subject matter, not the quantity, that is significant.

Here, a reading of Rosario's testimony—that he saw Stokes drop the bag that was found to contain drugs—and an examination of the charges later brought against Rosario lead us to conclude that he did not testify about the "transaction, matter or thing" for which he was later indicted or about a "topic" that formed the basis of the indictment; therefore, he did not acquire immunity.

Of course, the testimony falls far short of proving "the crime in its entirety," since there is not the slightest reference to the actual events and conduct on which the indictment was based. Nor can the testimony be said to "tend" to a conviction in combination with some other proof. Rosario's alleged observation of Stokes outside the building does not "tend" to convict Rosario of crimes arising out of his conduct earlier that day in Jackson's apartment. The mere fact that the testimony concerned Stokes, as well as the day and general location of Rosario's crimes, does not suffice to transform the subject matter into the very "transaction, matter or thing" for which Rosario was indicted, nor, put another way, can it fairly be said that his conduct inside Jackson's apartment was the "topic" discussed in the Grand Jury. In *People v Petgen* (92 AD2d 693), a defendant was denied immunity for a homicide where he had told a Grand Jury investigating a different crime that he knew the manner of decedent's death and the whereabouts of

decedent's vehicle on the day he was killed—in front of defendant's own home (see also, *People v Weisman*, 231 AD2d 131, lv denied 90 NY2d 1015; *Matter of Gelinas v Barrett*, 147 AD2d 293); that testimony was insufficient to link him to or tend to convict him of the killing with which he was later charged. In the instant case, moreover, any connection between what transpired inside Jackson's apartment and, allegedly, in the alleyway, is all the more tenuous given the completely false nature of Rosario's Grand Jury testimony.

We note the dissent's contention that, with respect to all the defendants' convictions for official misconduct, the People failed to show that defendants intended to obtain a "benefit," defined in Penal Law § 10.00 (17) to be "any gain or advantage." We agree with the trial court's finding that the return of defendant DeVito's radio was a specific, personal benefit to these defendants as well as a benefit to the Police Department. According to the defense, the radio was blatantly being used by drug dealers to taunt the police officers and to monitor and thwart police activity in the area (including the actions of these defendants), thereby not only causing them embarrassment but also placing them in jeopardy. Unlike *People v Esposito* (160 AD2d 378, 379, lv denied 76 NY2d 787), where we found that the benefit, alleged to have accrued only to that defendant's employer, was "ill-defined," here the indictment alleged and the proof supported a specific benefit. Moreover, while the dissent views an attempt to recover police property to be irreconcilable with any "culpable" motive on defendants' part and thus inconsistent with the "benefit" element of the statute, the detailed record of defendants' egregious conduct clearly demonstrates that the statute was satisfied in every respect.

With respect to the dissent's argument that the convictions of unlawful imprisonment as to Maribel Delgado must be reversed because she could have been arrested for two crack vials found in her possession, the jury was entitled to determine, as it did, that she was forcibly restrained not for the vials (discovered after she was forcibly pulled into the apartment) but for the same reason as the others—in the attempt to recover the lost radio at all cost. While the dissent further finds the verdict to be inconsistent to the extent that defendants were found not guilty of burglary but guilty of criminal trespass and official misconduct, we note first that the issue is unpreserved. In any event, it is not within the province of an appellate court to speculate on the jury's deliberative process, so long as the verdicts are not repugnant, which they are not.

This jury was entitled to conclude, for example, based on the evidence before it, that defendants unlawfully entered the premises in question without intent to commit a crime therein, but did engage in conduct constituting official misconduct once inside (*see generally*, *People v Gaines*, 74 NY2d 358, 363).

Finally, as to each defendant, we perceive no abuse of discretion with respect to the sentences imposed by the trial court.

Accordingly, the judgments of Supreme Court, New York County (Joan Sudolnik, J., at *Kastigar* hearing; Bonnie Wittner, J., at jury trial and sentence), rendered October 3, 1994 as to defendants Feerick and Rosario, and October 6, 1994 as to defendants DeVito and Schultz, convicting each defendant of unlawful imprisonment in the second degree (four counts), coercion in the second degree (one count), criminal trespass in the second degree (one count as to each defendant except two counts as to Feerick), and official misconduct (one count as to Rosario and Schultz and two counts as to Feerick and DeVito); and convicting Rosario of perjury in the first degree and DeVito of falsifying business records in the first degree; and sentencing Feerick to concurrent terms of one year or less on all convictions except coercion, for which she was sentenced to a consecutive one-year term; sentencing Rosario to 1 to 3 years on the perjury conviction and lesser concurrent terms on all other convictions; sentencing DeVito to eight concurrent one-year terms, and one concurrent six-month term; sentencing Schultz to three years' probation; and ordering all defendants to pay restitution to one complainant, and ordering Feerick alone to pay restitution to another complainant, should be affirmed. The matter should be remanded to Supreme Court, New York County, for further proceedings pursuant to CPL 460.50 (5).

Tom, J. (dissenting in part). Defendant Patricia Feerick was a police lieutenant assigned to the 25th Precinct in charge of special operations. As part of her responsibilities, she supervised three sergeants and several anti-crime officers as well as officers assigned to the Street Narcotic Enforcement Unit (SNEU) and the Community Police Officer Program (CPOP). Defendants Orlando Rosario and John DeVito were officers assigned to SNEU under Lieutenant Feerick's command, and defendant Mayra Schultz was an officer assigned to CPOP, also under Lieutenant Feerick's command. The precinct's commanding officer was Deputy Inspector William Friedlieb. Lieutenant Feerick reported directly to Friedlieb.

On or about September 22, 1990, Officer DeVito's police radio was stolen from him during a drug arrest operation. When DeVito reported the loss, he was investigated as to the cause of the loss and was found not to have committed any misconduct in the loss of the radio. On cross-examination, Deputy Inspector Friedlieb clarified that this meant that the radio was not negligently lost by the officer, but that it was stolen from him during an arrest.

It is not seriously disputed that the retrieval of the radio was critically important. Nor is it seriously disputed that this goal was the only one that motivated the defendant officers in taking the actions that led to Departmental charges and eventually to indictment.

Detective Robert Miller, testifying for the People, indicated that a user of this type of radio can access the frequency of the radio dispatcher, from which it can be determined when an assignment is dispatched and how the receiving officer is responding in a specific area. Deputy Inspector Friedlieb noted that the officers in Feerick's command were "known in the area" in connection with the regular enforcement of narcotics laws. Friedlieb himself testified that the unauthorized transmission greatly concerned him, since the transmitter could readily interfere with important police transmissions and operations. In the wrong hands, the radio also could jeopardize police officer safety. He knew that the radio probably was possessed by drug dealers.

Friedlieb, also in the context of the People's evidence, recalled that after the loss, Lieutenant Feerick had brought to his attention that someone "in the street" had communicated over the radio by an unauthorized transmission words to the effect that the transmitter could observe the officers.

The police action to recover the police radio occurred in the Taino Towers apartment complex at 221 East 122nd Street in Manhattan. Taino Towers also was the operational base of a violent drug organization, the Purple Caps. The evidence in this case suggests that Tower One of the complex was honeycombed with people and activities connected in one way or another with the Purple Caps. Complainant Benjamin Stokes was a lieutenant in the Purple Caps, several of whose members, including Stokes, routinely were arrested as a consequence of undercover operations conducted by members of Lieutenant Feerick's command as well as other officers. In fact, the 25th Precinct had been specifically targeting the Purple Caps, which resulted in hundreds of arrests during the preceding six months.

When Lieutenant Feerick advised Friedlieb that she had information about the whereabouts of the radio, she requested permission to conduct a consent search at the premises. The ordinary protocol would be to give the assignment to detectives, and, in fact, he directed her to do so or to get a search warrant.

The information on which Lieutenant Feerick was acting had been provided by an informant. The informant had been arrested by officers in the 25th Precinct; in return for consideration, she gave information where the radio could be found, connected the theft with "Ray" and "Ben," and thereupon was converted into a confidential informant. Her information eventually was the basis for the search warrant, which was executed by Detective Masci on an incorrect apartment. Notably, Masci testified on cross-examination that when he secured the search warrant, it was a "no knock" warrant, which authorized police to go so far as to knock the door down. Masci's testimony directly related the issuance of the "no knock" warrant to anticipated threats to the safety of the entering officers. This testimony, of the People's own Departmental witnesses, underscores the gravity with which the targets of the anticipated lawful search were being treated.

The officers' investigation into the location of the stolen radio clearly was directed at Benjamin Stokes, and that interest clearly did not result from a mere hunch. For instance, witnesses recalled that shortly after the theft of the radio, Stokes had been heard asking where "his radio" was. At trial, when he was testifying against the officers, he necessarily had to distance himself from the theft of the radio. He sought to explain that on September 25th, he had been selling drugs on the street. During this time, he had a walkman on, but at some point he had asked complainant Lemoura Denise "Nikki" Jackson to take his walkman upstairs. She forgot to do so, so that he lost his "radio," which explained why he asked several times that evening "Did anybody see my radio?" The officers' founded suspicion in Stokes led them to the apartment in which Stokes resided. Stokes rented a room from "Nikki" Jackson in her apartment.

Lieutenant Feerick and her team proceeded to apartment 3202 in the Taino Towers complex before 9:00 A.M. on September 26th, announcing their arrival with a knock on the door. They did not have a search warrant. Here, accounts diverge.

The officers testified that after they identified themselves and stated the nature of their interest, they were allowed into

Nikki's apartment, with no guns drawn, by Nikki, who assured them that she had no knowledge of a radio and that she would agree to a search. Nikki recalled that the uniformed officers rushed in with guns drawn and that two officers—she did not recall whom—placed her against a wall. Nikki was a witness with significant credibility problems regarding her background as well as her testimony, requiring circumspection in the evaluation of her testimony. She was asked about Stokes's whereabouts and for the return of the police radio. Nikki acknowledged knowing Stokes but said she did not know anything about the police radio. Two other officers looked around the apartment to see who else was there. Nikki recalled that shortly afterward, Feerick walked Nikki to a bedroom and left Officer Rosario—who remained polite and courteous—with her; his gun remained holstered. Shortly after, another male officer entered the bedroom displaying a cigarette box of crack from a drawer; Stokes later admitted that this was his, but at the time of the recovery of the crack, it could not be connected with any particular occupant of the apartment.

Complainant Theresa Johnson, Nikki's friend, recalled that Rosario woke her up in the bedroom. When she tried to go back to sleep, Feerick entered her bedroom and told her to get out of bed. She was brought to the bedroom in which Nikki was held and was asked about the radio, but Theresa denied any knowledge. Theresa's testimony also warrants circumspection.

Nikki and Theresa testified that after about 20 minutes, they were brought back to the living room. They noticed that the living room had been searched and ransacked, and observed handwriting on the wall communicating "all's we want is the * * * radio." Shortly after, they heard a knock on the front door, and Maribel Delgado, Stokes's girlfriend and drug-dealing associate, was brought inside. Maribel, holding a crack stem and two crack vials in her hand, expressed surprise and asked where Stokes was. The officers placed her against the wall as she dropped the contraband. Maribel was asked by Feerick the whereabouts of Stokes. She indicated that Stokes was in the apartment belonging to Monty Jimenez on the sixth floor.

Feerick and other officers then accompanied Maribel to Monty's apartment. At Monty's apartment, the officers asked her to ring the bell and step aside. When the door opened, she heard Stokes express surprise as the officers rushed in, after which she went home, unhindered, and went to sleep. She was never arrested for possession of the crack vials. She had never been told while in Nikki's apartment that she was not free to leave,

she had not been treated abusively and she never saw drawn guns.

Stokes testified that on the morning of September 26th he had gone to Monty's studio apartment—Monty loaned it to the Purple Caps for drug selling that day—which he entered with a key provided by the Purple Caps. Monty's apartment was only a stash house for Stokes. On the morning of September 26th, when he opened the door to exit, he faced several uniformed officers, including Rosario and Feerick, waiting outside with guns drawn. He had not been responding to a knock on the door and he had no awareness that officers were outside as he went to exit. When he tried to force the door closed, they forced their way in, placed him face down on a bed and conducted a search. A female officer asked about the radio several times, but did not accept his disclaimers of knowledge. Stokes had 16 bundles of crack containing almost 600 crack vials in the apartment. The officers found the crack; nothing else was removed. Stokes at that time was the sole occupant of the premises at which the crack—admittedly his—was recovered. The officers then told Stokes that they would "forget about the drugs" if they got their radio back. Stokes testified that, while he still did not know anything about the radio, he agreed to help the officers retrieve it.

When Stokes finally conceded to the officers that he knew about the radio, they took him—unhandcuffed—to Nikki's apartment which he noticed was in disarray. Again, the officers indicated that they would "forget about" the drugs in exchange for the radio. He agreed to cooperate in the retrieval of the radio. Stokes conceded having told the officers that he knew who had the radio. The officers gave Stokes until 5:00 P.M. (i.e., another three hours) to retrieve the radio. They then let him go. At trial, Stokes tried to explain that it was only when he exited the building that he ran into "Candy," an underling in the drug operation, and explained his predicament, and that an unidentified passerby indicated that he knew who had the radio. Stokes then arranged to drop off the radio in a concealed location and called the precinct that night, with the result that the police got their radio back. In whatever manner Stokes seeks to explain his role, the evidence is undisputed that the officers found Stokes, to whom they had been directed, in the proximity of a large quantity of drugs, and that in exchange for lenient treatment, he was pivotally responsible for the return of the radio within a short time period. That evening, an unidentified person brought the police radio to Taino Towers' security personnel, who then returned it to the 25th Precinct.

Detective Robert Miller of Internal Affairs (IAD) had been assigned the case on September 26th when Nikki Jackson called with the complaint against the defendant officers. Miller responded at about 5:30 P.M. and described the upheaval in which he found her apartment. It was "very sparsely furnished," with only one or two items of furniture in the living room. This contrasts with Stokes's description of Nikki's apartment as very "comfortably" furnished. Miller observed that cushions were either on the floor or falling onto the floor, with the glass of a picture broken on the floor, and the aforementioned writing on the wall. Plaster from an apparent hole in the wall a couple of inches wide was located behind the couch near a radiator. In the bedrooms, clothes were strewn on the bed or on the floor and bedding was pulled off of one bed. Curtains had been removed, and the rug was pulled up in one place. He photographed the scene. Nikki was "distraught" and "very, very emotional."

The defendant officers returned to the precinct that afternoon. The vials of crack were vouchered under DeVito's name. The voucher indicated that the vials had been recovered from the rear of the building. DeVito also prepared a complaint report on which he recorded that a fleeing man had dropped a package containing 591 vials. These statements were false. Of course, to whatever extent DeVito thereby demonstrated a consciousness of guilt, it could not be imputed to his codefendants (*People v Paulino*, 187 AD2d 736, *lv denied* 81 NY2d 792).

When Detective Masci called that afternoon to get a floor plan in connection with the search warrant, he was not told that the officers had already conducted searches. On the other hand, the Feerick-led search at that time seemed to have been inconclusive, and the search warrant was for a different apartment. The warrant was executed by Masci and a team that evening at 8:25 P.M., on the wrong apartment. The radio was returned at 10:30 P.M.

A couple of weeks later, Stokes ran into Officer "Gale", who had participated in the search of the apartments. "Gale" jumped out of a squad car and conducted a body search, including the inside of Stokes's shirt. "Gale" asked whether Stokes was "wearing a wire" for IAD. At this point, Stokes was not cooperating. He declined to cooperate when IAD contacted him a few weeks later, since, as far as he was concerned, the officers had let him go and he had nothing against them. However, this changed when he was arrested by Officer Rosario on Janu-

ary 5, 1991 for the crack seized on September 26th. Rosario informed an Assistant District Attorney that Stokes was arrested because he had seen him drop a bag of crack vials to the ground. Stokes then contacted Detective Miller in IAD. However, Stokes still resisted cooperation, so that in a conference following a March 1991 arrest on another drug charge, Stokes was told by Miller that if he declined to testify against defendants, his sentences on open cases would run consecutively rather than concurrently to each other. He cooperated, leading to the reopened IAD investigation against the officers and, with Stokes's statement, to the eventual indictment.

In connection with Stokes's arrest, Rosario signed the felony complaint indicating that the fleeing Stokes had dropped the vials. The complaint form includes a warning that false statements are punishable as a misdemeanor. Rosario also testified before the Grand Jury in a similar manner, after which Stokes was indicted for criminal possession of a controlled substance in the third degree. These statements were false.

The District Attorney's office initially declined to prosecute defendants. The Chief of the Official Corruption Unit notified IAD by letter dated January 7, 1991—two days after Stokes was arrested—that although disciplinary action was warranted, criminal charges would not be pursued. Subsequently, the officers were interviewed by IAD. Departmental charges and specifications were filed on April 23, 1991. Despite the prosecutor's initial decision not to prosecute, the matter was presented to the Grand Jury in February and March 1992. The indictment essentially tracked the Departmental charges.

Defendants were charged together in a 30-count indictment in connection with the entry and search of the apartments, the detention of the occupants therein and subsequent false entries, false statements and false testimony. Not all counts pertained to all defendants, though. The counts that were presented to the jury can be grouped by charge and defendant for simplicity's sake. All defendants were charged with and convicted of four counts of unlawful imprisonment in the second degree (Penal Law § 135.05), which alleged that each defendant restrained Nikki Jackson, Theresa Johnson, Maribel Delgado and Benjamin Stokes. All four defendants were charged with four counts of coercion in the second degree (Penal Law § 135.60 [8]), each relating to one complainant, alleging in unadorned phrasing that each defendant compelled a complainant to engage in conduct that they had a legal right to abstain from engaging in and to abstain from conduct that each

complainant had a right to engage in. However, the jury only convicted each defendant on a single count. Each defendant was charged with two counts of burglary in the second degree (Penal Law § 140.25) arising out of the entry into Monty's and Nikki's apartments, respectively, with the intent to commit a crime therein. The jury acquitted all defendants of burglary, but convicted all defendants of the lesser included offense of criminal trespass in the second degree (Penal Law § 140.15) arising out of entry into Nikki Jackson's apartment, and only Feerick of a second count of criminal trespass in the second degree arising out of her entry into the second apartment. All defendants were convicted of one count of official misconduct (Penal Law § 195.00 [1]) in connection with the entry into and search of Nikki's apartment. DeVito was also convicted of an additional count of official misconduct relating to his submission of false police entries. Feerick was convicted of an additional count of official misconduct in connection with the entry of Monty's apartment; the remaining defendants were acquitted on this count. Rosario was convicted of perjury in the first degree (Penal Law § 210.15) in connection with his false Grand Jury testimony. DeVito was convicted of one count of falsifying business records in the first degree (Penal Law § 175.10) in connection with his filing of false statements as Police Department records. Several remaining counts charging the defendants with a variety of larceny- and bribery-related offenses either were not submitted or resulted in acquittals.

Notably, during the court's final charge to the jury on the substantive offenses, the court clearly instructed the jury that if the officers' presence without a warrant in the apartments was not predicated on consent, exigency or emergency, then the police presence was "unlawful." The defense objected that this formulation, relating to suppression issues, impermissibly allowed the jury to leap from such a finding of "unlawfulness" in a Fourth Amendment context to criminalizing the officers' presence on that basis. The court, noting that she had tracked the accusatory language in the indictment relating to the charge of official misconduct, declined to address the objection. The instruction was technically correct. However, the exchange underscores one of the troubling aspects of this case, where the very nature of the "unlawfulness" of the officers' conduct was so centrally in dispute.

Feerick was sentenced to terms of one year or less on all convictions. The sentences were concurrent except for coercion, for which a one-year term was imposed to run consecutive to

the other terms. Rosario was sentenced to 1 to 3 years on the perjury conviction, and lesser concurrent terms on the remaining convictions. DeVito was sentenced to eight concurrent one-year terms, and one concurrent six-month term. Schultz was sentenced to three years' probation. All defendants were additionally ordered to pay $1,367 restitution to Lemoura Denise Jackson, and Feerick was ordered to pay restitution to Altilano Jimenez in an amount to be determined. Defendants appeal on grounds including, *inter alia*, whether the evidence was legally sufficient to convict defendants of the various charges and whether defendants' sentences were excessive.

Defendants were convicted of official misconduct in violation of Penal Law § 195.00 (1). That the officers were charged under the first, rather than the second, subdivision requires the conclusion that the defendants were charged with official malfeasance, relating to conduct within the apartment, rather than official nonfeasance (*see*, Penal Law § 195.00 [2]), potentially arising from the agreement not to arrest Stokes. The statute states in relevant part that a public servant "with intent to obtain a benefit * * * commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized". "Benefit" is defined by the Penal Law to be "any gain or advantage to the beneficiary and includes any gain or advantage to a third person pursuant to the desire or consent of the beneficiary" (Penal Law § 10.00 [17]). Although the element of "benefit" is central to the offense of official misconduct, it is not unique to that offense, and its construction with regard to other statutes is equally applicable to its application to the present offense. Statutory construction of the Penal Law requires that statutory terms "must be construed according to the fair import of their terms to promote justice and effect the objects of the law" (Penal Law § 5.00).

Two questions are presented: whether a "benefit" was conferred in this case; and what was the Legislature's notion of a third-party benefit in including this language in the statute? The answers are not readily apparent from the face of the statute, but require consideration of legislative intent.

The offense of official misconduct is related to the bribery-type offenses set forth in article 200 of the Penal Law. The distinction is that the bribery offenses address the payment or receipt of the bribe itself, whereas the offense of official misconduct addresses the underlying act for which the bribe is to be paid or received (*see*, 10 Zett, New York Criminal Practice,

Official Misconduct, ¶ 115.2 [1], and cites therein). Hence, an uncompleted bribe will not render a charge of official misconduct legally insufficient (see, e.g., People v Hurst, 160 AD2d 1023 [2d Dept 1990]). However, the common feature of the different statutes is that of implicit corruption, manifested in graft, either direct or indirect. This explains the placement of both article 195 and article 200 in title L—offenses against public administration.

The conclusion that the legislative purpose was to punish venality in public servants rather than misplaced zealotry is apparent by the utilization of the element "benefit" in title L and the consensus in case law as to its general meaning. It was recognized early that the benefited defendant's culpable motive "must be of a venal nature" (People v Thompson, 58 Misc 2d 511, 513), a conclusion that comports with the legislative scheme. The inclusion of an element of specific intent was a departure from former law, which consisted of some 30 narrow offenses restricted to specific kinds of malfeasance or nonfeasance that were "virtually crimes of absolute liability" (Commn Staff Notes to Revised Penal Law, proposed art 200 [Official Misconduct], reprinted in Gilbert Criminal Law and Procedure, at 2A-88 [1974 ed]). As originally proposed, the offense also would have reached wrongfully depriving another of a benefit, but would have excluded unauthorized conduct that would belong in the disciplinary realm (ibid.). In the present case, far from being venal, the recovery of the police radio was an appropriate goal for these officers. Moreover, there is not a hint of corruption in connection with recovery of the radio or, indeed, in connection with any of these officers.

Turning to the definition of "benefit," it need not be explicitly or directly personal, a legislative recognition of the subterfuges available when parties agree to evade lawful requirements to their mutual benefit. For instance, in a prosecution involving theft of Medicaid funds, a third-party benefit has been interpreted to include a gain to the defendant's business, which indirectly benefited the defendant (People v Severino, 91 Misc 2d 898, affd 63 AD2d 1010), and an elected official steering a construction contract to a contractor after communicating to a third party the sum of the expected gratuity (People v Hurst, supra), schemes manifestly not present herein. However, there must be some nexus to the defendant. In the case at bar, a fair and reasonable construction of the term "benefit" does not support a conclusion that any beneficial result, no matter how amorphous may be the actual benefit from the perspective of

the defendant, can fit logically and semantically within the meaning of benefit.

Here, the People are hard pressed to demonstrate any personal benefit, pecuniary or otherwise, to any of the officers. DeVito was cleared of any Departmental stigma in connection with the loss of the radio, so that he did not benefit in that sense by its recovery. Although the People cavil that the radio was "a concrete, tangible object", and the recovery of the radio as the requisite benefit was essential to the theory of the indictment, this misses the point entirely. The recovery of the radio was not a tangible, concrete benefit to these officers. Any claim that these officers would benefit in the sense that their own personal safety while on the street would be better assured is so attenuated as to not be a concrete personal benefit. At best, the People advance a theory that the benefit was to be realized by others, which presents thin reasoning as a basis for culpability under the circumstances of this case. Moreover, the statute requires consent by the third-party beneficiary, manifestly lacking here. But even taking the argument at face value, that the recovery of the radio was to be equated with a benefit to fellow officers and the Department, this attenuated "benefit," such as it is, does not comport with the statutory meaning of "benefit" nor does it fit within the intended proscriptions of the crime of official misconduct. We have explicitly rejected liability under Penal Law § 195.00 (1) when prosecution was "based upon some ill-defined benefit to defendant's employer" (*People v Esposito*, 160 AD2d 378, 379, *lv denied* 76 NY2d 787). In *Esposito*, a Metro-North police chief improperly accessed computer records, containing confidential information, compiled by the New York State Police Information Network, to locate a potential criminal record of a prospective employee. The putative benefit was not to the defendant, but to Metro-North, with regard to hiring.

While the People presently argue that we rejected the reasoning of the trial court in *Esposito*, our decision does not support that contention. Nor did we reject that trial court's conclusion, drawing on the construction of the term "benefit" in bribery cases (*People v Hyde*, 156 App Div 618; *People v Cavan*, 84 Misc 2d 510; *People v Adams*, 86 Misc 2d 634), that the benefit must be more than tangential and have some personal nexus with the defendant. In recent case law, the Third Department examined the issue of what constitutes a sufficiently personal nexus where the prosecution alleged that a municipal police chief allegedly tried to influence a confidential informant

so as to acquire information from her about another law enforcement officer's inquiries into drug use by the police chief and his friends, thereby putatively realizing a benefit. The prosecutor in that case contended that this would establish the requisite personal nexus, rather than a mere official nexus, to the putative benefit. The Court rejected the distinction as factually speculative in that case, but also on the basis that, even if factually sound, the "benefit" to the defendant constituted no more than an "illusive hope" (*People v Dolan*, 172 AD2d 68, 74, *lv denied* 79 NY2d 946). So, too, any contention that recovery of the radio, as a means of protecting undercover operations, somehow inured to the personal benefit of these officers relies on an illusory linkage.

When the requirement of venality is coupled with the requirement of a personal interest—even allowing that personal interest often may be disguised in a third-party arrangement—the facts of this case simply fail to establish a benefit to these defendants by any fair method of statutory construction. These counts should have been dismissed.

With respect to the unlawful imprisonment convictions, at least as to Maribel, I would reverse and dismiss. Maribel's possession of crack vials provided the officers with probable cause for her arrest, defeating the unlawful imprisonment claim; notably, she eventually was released. Whether or not one may cavil with the reason for the release does not defeat the lawfulness of the original restraint.

The jury acquitted the defendants of burglary in the second degree (Penal Law § 140.25). The elements of the basic offense of burglary are a trespass in addition to the further intent to commit a crime within the premises, formed upon entry or while remaining unlawfully within. Since the jury convicted the defendants of the lesser included offense of trespass, the conclusion to be drawn is that the jury found that the officers lacked the intent to commit other crimes within the premises at the time they entered or remained unlawfully within. That conclusion undermines the thrust of the prosecution that these officers raided the apartment with an intent to do whatever was necessary to retrieve the radio. There also is inconsistency in the jury's verdict, finding both trespass and the intent to commit further crimes within the premises, either upon entry or upon unlawfully remaining within, yet acquitting the officers of burglary.

The unlawful entry in this case and the resulting trespass convictions raise conflicting policy concerns that go well beyond

the circumstances of this case. One wants clear policy providing an adequate remedy when police enter a private dwelling without constitutional authority. When the process fails to comply with constitutional safeguards, the remedy typically is suppression, though in egregious cases the further remedy of administrative or even civil sanctions may be appropriate. This is such a case. However, notwithstanding the technical legal sufficiency of the charge of trespass, it is a very troubling leap to convert an "unlawful" entry into criminal trespass. The countervailing policy concern is that officers, pursuing valid goals but failing to comply with all technical aspects of the process by which searches and seizures must be conducted, now face more than only suppression or even putting their badge on the line. It does not take an overly generous interpretation of our holding today to expose careless or overly zealous police activity involving warrantless entries or warrantless arrests carte blanche into criminal liability. Where does one draw a clear line? The majority decision provides no guidance. The question whether exigency or an emergency exists may well lead, reasonably, to different conclusions depending on whether one is a police officer on the street or a jurist. Ultimately, the answer is a legal conclusion and not an investigative conclusion. But the fact of an eventual legal conclusion does not eliminate uncertainty as officers respond to a factually unclear situation. Creating the spectre of a trespass or unlawful imprisonment indictment, or charges arising out of demands for relevant information, can only lead to officers resolving uncertainty by minimizing their responsiveness. These officers were wrong, but, as the majority now affirms their convictions, the remedy exceeds the necessary cure.

Finally, for these and similar reasons, I would find the sentences meted out to constitute, in large part, a significant abuse of discretion. Here I address myself to the charges other than perjury and falsifying business records. For the most part, the charges were misdemeanors, allowing for a maximum sentence of one year (Penal Law § 70.15). The circumstances in this case were factually murky. These were not rogue officers; to the contrary, their professional reputations appear to be held in high regard. The sentencing court even noted Feerick's "meteoric rise" through Departmental ranks and her outstanding performance evaluations, which "consistently indicated her leadership qualities, career potential and dedication to the job and her professionalism." The court also noted the numerous letters of community support in connection with Feerick's ag-

gressive police work, especially in the area of drug enforcement. The sentencing court noted sentencing memoranda attesting to Rosario's "outstanding character, his dedication and commitment to the job, [that he] related well to members of the community * * * and demonstrated 'excellent police ethics in areas of trust, honesty, integrity'." Even Nikki Jackson described Rosario as polite and courteous. There is a profound irony in this case when one considers who is being incarcerated and who was released. Nevertheless, the court set itself the task of sending "a message that police misconduct can never be tolerated." While one may agree with the spirit of that assertion, the court's own zeal in sending the message carried the sentences outside of legitimate and reasonable bounds.

The officers' goal, though not the means, was legitimate. The officers have lost jobs and careers as a consequence of their excessive zeal; we all agree that but for the absence of the warrant, the entry would have been lawful, and the recovery of drugs would have been a predicate to arrest several of the complaining witnesses. The evidence indicates that a "no knock" warrant, in fact, was being processed, although it was executed at a different, incorrect, location, so that these officers were not entirely arbitrary. The People argued in summation that each and every one of these complainants had no personal motive to expand upon the truth. However, the People's main witnesses had substantial criminal records and credibility problems. Nikki Jackson had a prison record involving fraudulent acts, including check cashing and credit card scams resulting in convictions. Her children had been removed from her by the Bureau of Child Welfare because of her drug addiction. Stokes was a self-admitted "assistant manager" in the Purple Caps drug organization, and had previously been convicted of shoplifting in 1982, the attempted sale of a controlled substance in 1989 (four months in prison) and possession of a controlled substance with the intent to sell in 1991 (two to four years). Delgado had two felony drug convictions. She sold and used drugs, and was incarcerated in State prison at the time of trial. The evidence makes clear that they were angered, Nikki Jackson justifiably so, and that Stokes, in particular, was motivated by anger at a broken deal. The officers' claim that the Purple Caps thereby found a basis to remove an aggressive police team, suggesting additional credibility problems at least for Stokes, does not appear to be speculative.

One wonders why this result occurred in this case, when the usual, more appropriate, response is administrative. For

instance, a Bench of our Court recently confirmed an administrative sanction for officers who, at gunpoint, on the basis of a tip, entered and searched another apartment associated with drug trafficking without a warrant or exigency; the officers threw the tenant against a wall and cursed her when a warrant was requested. The officers frisked both occupants and conducted a search of the premises, before being convinced that they had the wrong apartment. When the tenant, who had recorded identifications and badge numbers, indicated that she would file a complaint, they responded that it was the tenant's word against that of the officers. At the subsequent departmental hearing, the officers denied having been in the apartment, an account which the Hearing Officer rejected. The administrative sanction in that case was 30 days' suspension (*Matter of Culkin v Safir*, 244 AD2d 162). Even when an officer falsified two affidavits, the administrative penalty was a 30-day suspension (*Matter of Morgillo v Bratton*, 202 AD2d 431). Of course, an appellate court's power of review does not extend to enhancing penalties that some might think to be unduly light. But there remains the problem of consistency. How does one reconcile the fundamentally and drastically different treatments of the erring police officers?

The apartment tenants will get restitution. These officers, by virtue of their discharge, will be unable to take any further steps with regard to these complainants. They no longer are officers. They have lost their livelihood as police officers. Each of the defendant officers now has a criminal record. Three of the defendant officers are facing jail sentences with Lieutenant Feerick receiving two consecutive maximum sentences. This is a case that, excepting the charges of perjury and falsifying business records, should have been handled administratively and civilly rather than criminally. For the misdemeanor offenses, I find it inexplicable that the maximum prison terms available were imposed, in one case consecutively. At the very least, I would have vacated the sentences except for the sentences imposed pertaining to perjury and falsifying business records. Additionally, I would dismiss the counts as noted above.

SULLIVAN, J. P., MILONAS and MAZZARELLI, JJ., concur in a Per Curiam opinion; TOM, J., dissents in part in a separate opinion.

Judgments, Supreme Court, New York County, rendered October 3, 1994 as to defendants Feerick and Rosario, and October 6, 1994 as to defendants DeVito and Schultz, affirmed.