

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-19-1999

# USA v. Davis

Precedential or Non-Precedential:

Docket 98-6251

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Davis" (1999). *1999 Decisions.* Paper 205.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/205

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 19, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-6251

UNITED STATES OF AMERICA

v.

VINCENT R. DAVIS,

Appellant

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Crim. No. 97-cr-00552)
District Judge: Honorable Alfred J. Lechner, Jr.

Argued: May 19, 1999

Before: BECKER, Chief Judge, RENDELL, and ROSENN,
Circuit Judges.

(Filed July 19, 1999)

      ANTHONY J. IACULLO, ESQUIRE
       (ARGUED)
      Iacullo & Saluto, P.C.
      103 Park Street
      Montclair, NJ 07042

      Counsel for Appellant

        FAITH S. HOCHBERG, ESQUIRE
        United States Attorney
        MAUREEN A. RUANE, ESQUIRE
          (ARGUED)
        Assistant United States Attorney
        GEORGE S. LEONE, ESQUIRE
        Assistant United States Attorney
        970 Broad Street
        Newark, NJ 07102-2535

        Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

This appeal arises out of a bizarre factual situation that reads like the plot of a Grade B melodrama. It requires us to interpret several statutes that protect the integrity of federal criminal investigations. The government has understandably attempted to find a law that criminalizes the conduct of defendant Vincent Davis, which is as reprehensible as it is unusual. In the process, however, the government has stretched several laws beyond their breaking points. We conclude that the evidence adduced at Davis's trial was insufficient to convict him of obstruction of justice, conspiracy to obstruct justice, or use of a telephone in aid of racketeering activity (violation of a New York statute prohibiting receipt of any benefit for violation of official duty). Nonetheless, Davis's conduct is not beyond the reach of federal law: There was sufficient evidence to convict him of witness tampering. We are persuaded, however, that he was entitled to an instruction on his intoxication defense to that charge and that the District Court's refusal to give such an instruction requires that he be given a new trial. Since Davis may be retried on the witness tampering counts, we resolve his objections to several of the District Court's evidentiary rulings. Because of our disposition of Davis's claims, we need not address his challenges to his sentence.

2

I. Facts

At the time of the relevant events, Davis was an officer with the New York Transit Police, although he was terminated in February 1997 following his indictment in the present case. Davis married Diane Pelatti in 1983, and the two were divorced in March 1994. Richard Sabol is a career criminal with lifelong ties to organized crime families. He and Diane Pelatti had dated in high school, and Davis testified that, when Pelatti and Sabol broke up, Sabol threatened to throw acid in her face and cut off herfingers. He also threatened Davis and Davis's family when Davis began to date Pelatti. Davis plainly developed an obsession with Sabol. On his own initiative, he attended Sabol's 1986 sentencing in New York for credit card fraud; obtained a copy of Sabol's "rap sheet"; and discussed Sabol with Agent Ronald Geer, an agent for the Federal Bureau of Investigation ("FBI"), who was present at the 1986 sentencing hearing.

In 1992, Sabol was convicted in Georgia on federal drug charges. Davis learned of Sabol's Georgia arrest in a roundabout fashion: In early 1992, he received a threatening phone call from a person he believed to be Sabol. He then contacted Agent Geer to find out whether Sabol could have made the call. Geer told him about the Georgia crime and stated that Sabol was going to prison for many years. What Geer did not tell Davis was that Sabol had become an informant in a Georgia investigation, for which he received a sentence reduction.

In late 1992, the U.S. Customs Service ("Customs") decided to use Sabol in the New York/New Jersey area to infiltrate the Giampa Crew, which was a branch of the Lucchese crime family. Sabol was acquainted with Gennaro Vittorio, who hoped to become a "made man" in the Giampa Crew. Vittorio's stepfather was Joseph Giampa, from whom the Crew took its name. Customs used Sabol in a ruse whereby Sabol told Vittorio and others that he was on work release and offered to engage in various illegal activities.

From October 1993 to January 1994, Sabol gained Vittorio's confidence and also met others in the Crew. They engaged in several small-scale transactions in allegedly

3

stolen merchandise, and also traded illegal guns and a small amount of heroin. These transactions were captured on video and audio surveillance. Sabol provided Vittorio and others in the Crew with cell phones, which became subject to a wiretap order on January 13, 1994.

Meanwhile, Davis heard from various acquaintances that Sabol was back in town. In view of Sabol's former relationship with his wife, this information made Davis extremely upset, especially as he was having marital difficulties. One of the people who warned him that Sabol had returned was Michael Lanteri ("Michael"), who was married to Maria Lanteri ("Maria"), Davis's sister. Michael and Vittorio were childhood friends, and Michael saw Vittorio with Sabol. Because Davis knew that Sabol's Georgia conviction should have kept him in prison for many years, Davis inferred that Sabol must have been cooperating with the authorities in order to get a sentence reduction.

Vittorio, who was ignorant of Sabol's Georgia history, became confident enough of Sabol's criminal tendencies that he sought to use Sabol to establish an import/export business in New Jersey to import drugs and export stolen vehicles. He gave Sabol $10,000 for this purpose on January 24, 1994. On January 25, 1994, however, Michael called Vittorio. He explained that he could not speak on the phone but insisted that Vittorio come to the Lanteris' apartment because Michael had important information for him. Moments later, Maria also phoned Vittorio and repeated Michael's urgings. Soon thereafter, Vittorio used his tapped cell phone to call James McManus, a member of the Giampa Crew, and stated that he could not talk on the cell phone because "there is a lot of static right now," but that he would page McManus from a pay phone, which McManus should then call. This was the first indication that the Customs investigation was souring.

As later testimony would show, Vittorio began to distance himself from Sabol because, at the Lanteris', Michael told him that he was being set up, that Sabol had been arrested for a serious crime and should not be out on the street, and that Vittorio's crimes were being captured on tape. Vittorio asked how Michael knew all this, and, after some initial

4

reluctance, Michael explained that Davis told him. Vittorio wanted to speak to Davis, whom he knew from the Lanteris' engagement party, so he went to Davis's house. Davis was drunk and paranoid, and he warned Vittorio that Sabol was a "rat," which Vittorio took to mean that Sabol might be wearing a wire, giving information to the authorities, or testifying in order to get a reduction in sentence.

In order to back up his story, Davis showed Vittorio a piece of paper with a federal prosecutor's name and Agent Geer's name on it. He told Vittorio that he had a good source for his information, an FBI agent, and that there was "just no way" that Sabol could be on the street without being an informant. Vittorio told Davis that Sabol had given him cell phones, and Davis responded that they were definitely tapped. He warned Vittorio that Sabol would testify against Vittorio. Vittorio testified that Davis told him to "do something about it" and that Davis asked him for a gun. Although Vittorio later broached the idea of killing Sabol to his stepfather, the stepfather immediately vetoed the idea. Vittorio testified that he never seriously considered murder, nor did he ever consider giving Davis a gun.

After that night, Vittorio and his confederates began to distance themselves from Sabol. On January 26, 1994, McManus told Sabol that he could not sign a lease for the warehouse needed for the import/export business because he had to work and because of a "serious problem." Vittorio told Sabol that a "minor" problem had developed. On January 27, 1994, Vittorio called Sabol and told him to return the money he'd received from Vittorio only three days earlier. Vittorio and the others also stopped using their cell phones for illicit business.

Sabol, sensing his opportunity slipping away, attempted to convince Vittorio of his trustworthiness. They talked on the phone on February 1 and February 18. Ultimately, Vittorio told Sabol that he had been informed that Sabol was working for the government. He suggested that there was a "crooked" FBI agent involved. This immediately triggered an FBI investigation into the source of the leak, as a result of which the Lanteris' phone was tapped.

5

Vittorio eventually told Sabol that Davis was the source of the information. Sabol thereupon explained that Davis hated him because of his former relationship with Pelatti. By the end of the February 18 conversation, Vittorio was almost positive that Davis had lied to him out of resentment and jealousy.

Sabol apparently contacted Pelatti that day. Pelatti informed Sabol that Davis had told her that he would do "everything in [his] power" to get Sabol back in jail. She also said that Davis told her that Sabol was out on work release and involved in illegal activities. At this point, Davis tried to reconcile with Pelatti and perceived Sabol as a threat.

On March 2, 1994, Davis once again contacted Vittorio, trying to convince him that Sabol was an informant. Vittorio dodged his calls, but ultimately the two met once again. Davis reiterated his earlier claims and suggested that Vittorio was on audio and videotape committing crimes with Sabol. He described his knowledge of Sabol's status as "gospel" and once again suggested that Vittorio should give him a gun. Davis was extremely drunk, at least by the end of the meeting. Vittorio was still unsure about Sabol; he sought a face-to-face meeting, believing that if Sabol were really an informant he would refuse such a meeting because of the danger to his safety. Sabol's handlers refused a face-to-face meeting on exactly those grounds.

In light of Vittorio's continuing reluctance to trust Sabol, Customs terminated its Giampa Crew investigation in April 1994. Indictments against members of the Crew came down in August 1994. Vittorio testified that, were it not for Davis, he would have continued to engage in illegal activities with Sabol, increasing his criminal liability in the resultant trial.

As a result of the FBI investigation into the leak about Sabol, Davis was charged with four different crimes comprising eleven counts: one count of obstruction of justice, one count of conspiracy to obstruct justice, two counts of witness tampering, and seven counts of using a telephone in aid of an unlawful act, specifically receiving a benefit for the violation of his official duty as a police officer. After a jury trial, he was convicted on all counts.

The District Court sentenced him to forty-five months' imprisonment on each count to run concurrently, and a $550 special assessment.

Because Davis was convicted after a jury trial, we must defer to the jury's verdict and view the evidence in the light most favorable to the government. See United States v. Sain, 141 F.3d 463, 466 (3d Cir. 1998). If there is substantial evidence upon which a reasonable jury could have based its verdict, we should affirm. See United States v. Obialo, 23 F.3d 69, 72 (3d Cir. 1994). The jury may make reasonable inferences from the evidence presented; the evidence need not unequivocally point to the defendant's guilt as long as it permits a finding of guilt beyond a reasonable doubt. See United States v. Pungitore, 910 F.2d 1084, 1129 (3d Cir. 1990). Insufficiency of the evidence claims, in particular, place a heavy burden on a defendant. See United States v. Gonzalez, 918 F.2d 1129, 1132 (3d Cir. 1990).

II. The Counts of Conviction

A. Obstruction of Justice

Count 2 of the indictment charged obstruction of justice under 18 U.S.C. S 1503. That law reads in relevant part:

> Whoever . . . corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

In order to violate S 1503, a defendant must have notice or knowledge of the pendency of some judicial proceeding constituting the "administration of justice." See United States v. Nelson, 852 F.2d 706, 710 (3d Cir. 1988). The District Court ruled that there were two possible judicial proceedings that Davis might have obstructed: the grand jury investigation into the Giampa Crew and the wiretap investigation. Though there is some confusion on this point, we presume that the jury would have considered the Customs wiretap rather than the later FBI wiretap

7

investigation into the source of the "leak" about Sabol's status.1

The verdict form provided to the jury separated the "grand jury obstruction" from the "wiretap obstruction" and allowed the jury to find Davis guilty or not guilty separately, and repeated this for the conspiracy counts. The jury found Davis guilty of both "grand jury obstruction" and "wiretap obstruction." Therefore, while we conclude that S 1503 does not prohibit "wiretap obstruction," thus invalidating Davis's conviction therefor, we must also evaluate the sufficiency of the evidence of "grand jury obstruction."

1. Wiretap Obstruction

As a foundation for this charge, Customs Agent James Delia testified that the Giampa Crew wiretaps were reviewed every ten days by the district court that authorized them. Davis does not contest this, but argues that a wiretap is not a "pending judicial proceeding" within the meaning of S 1503. This is an issue of first impression in the federal courts. We conclude that the wiretap was at bottom an element of the Customs investigation and that it could not be a "pending judicial proceeding" within the scope of the statute.

Courts have repeatedly held that an investigation simpliciter is not enough to trigger S 1503. For example, intentionally interfering with the execution of a search warrant by warning its target to conceal or dispose of evidence does not involve a pending judicial proceeding and therefore falls outside of S 1503. See United States v. Brown, 688 F.2d 596, 598 (9th Cir. 1982). Investigation by agents of the Treasury Department "or some other like instrumentality" of the United States does not constitute a pending proceeding. United States v. Perlstein, 126 F.2d 789, 792 (3d Cir. 1942); see also United States v. Simmons,

_____

1. We do so because Davis's acts indicated that he surmised the existence of the Customs wiretap, and he interfered with its success. By contrast, there was no evidence that he had any idea that the FBI wiretap existed, and the government did not argue that his acts interfered with its success. It was evident in context that the charged "wiretap obstruction" involved the Customs investigation, just as the "grand jury obstruction" did.

591 F.2d 206, 208 (3d Cir. 1979) ("[T]he obstruction of an investigation that is being conducted by the FBI, or by any similar governmental agency or instrumentality, does not constitute a S 1503 violation because such agencies or instrumentalities are not judicial arms of the government `administering justice.' "). Even probation supervised by court-appointed officers does not constitute a pending proceeding. See Haili v. United States, 260 F.2d 744 (9th Cir. 1958). Thus a wiretap, which is generally part of an investigation conducted by agents of the executive branch, would seem to fall within Perlstein's and Simmons's description of investigations that are insufficient to invoke S 1503.

The government nonetheless argues that a wiretap investigation may constitute a judicial proceeding within the meaning of S 1503 where it is monitored actively by a federal district court, citing United States v. Aguilar, 515 U.S. 593 (1995), and United States v. Walasek, 527 F.2d 676 (3d Cir. 1975). However, Aguilar does not support the government's claim. Indeed, in that case, the government charged the defendant's wiretap-related conduct under a separate statutory provision that prohibits revealing the existence of a wiretap, 18 U.S.C. S 2232(c); his S 1503 obstruction charge related to conduct specifically involving a grand jury.

The government's theory is drawn from our caselaw, which has heretofore focused on when a grand jury investigation progresses to a stage where it can be said to be "pending." Describing the level of involvement a grand jury must have with an investigation to triggerS 1503, we wrote:

> Appellant would have us adopt a rigid rule that a grand jury proceeding is not "pending" until a grand jury has actually heard testimony or has in some way taken a role in the decision to issue the subpoena. He offers no authority for such a rule, and we are not inclined to adopt it. Appellant is correct in his observation that a grand jury subpoena may become an instrumentality of an investigative agency, without meaningful judicial supervision. Nevertheless, the remedy against potential abuses is not to establish a rule, easily circumvented,

9

by which some formal act of the grand jury will be required to establish "pendency." The remedy is rather to continue to inquire, in each case, whether the subpoena is issued in furtherance of an actual grand jury investigation, i.e., to secure a presently contemplated presentation of evidence before the grand jury.

Walasek, 527 F.2d at 678 (footnote omitted) (emphasis added).

The government seizes upon the phrase "judicial supervision" to argue that, because the wiretap was subject to judicial supervision, it is sufficiently analogous to a grand jury investigation to qualify as a "pending judicial proceeding." The flaw in the government's argument is that judicial supervision is not the test; the test is whether there is a judicial proceeding. Walasek considered the role of the grand jury in investigations, and we decline to read one phrase in that decision as authorizing a sweeping expansion in the concept of "pending judicial proceedings," one for which the government has no other support.

Fundamentally, a wiretap order is an investigative method used by the executive branch, not an element of the judicial process. See United States v. Giordano, 416 U.S. 505 (1974) (discussing the history of wiretapping regulation). Judicial supervision pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. SS 2510-2520, does not make wiretaps a function of the judicial branch, but rather ensures that wiretaps-- searches--are carried out within the confines of the Fourth Amendment. See United States v. Cafero, 473 F.2d 489 (3d Cir. 1973).

We conclude that a wiretap order is more like a search warrant than it is like a grand jury and that its pendency does not constitute the "administration of justice" within the meaning of S 1503. See Brown, 688 F.2d at 598. It follows that Davis cannot be convicted of violatingS 1503 for intentionally interfering with a wiretap.

2. Grand Jury Obstruction

A grand jury investigation clearly qualifies as a pending judicial proceeding under S 1503. See United States v.

Wood, 6 F.3d 692, 696 (10th Cir. 1993). The District Court, in its written opinion upon Davis's sentencing, found that there was a pending grand jury investigation into organized crime and the Giampa Crew in particular at the time of Davis's acts. However, the trial record is nearly barren of any evidence of this fact. The government identifies one piece of evidence in support of its contention--the testimony of Agent Delia, who testified that, before obtaining the wiretap order of January 13, 1994, Customs subpoenaed subscriber information and toll records for a number of customers from NYNEX. But Agent Delia did not testify that a grand jury was actually in the process of investigating the people whose records were subpoenaed or that the subpoena issued in furtherance of a presently contemplated presentation of evidence before a grand jury.

As in many districts in modern times, a grand jury is always empaneled in the District of New Jersey, which comprises the entire state of New Jersey. For that very reason, the mere existence of a grand jury in a district does not trigger S 1503; the grand jury must have some relationship to the investigation that is obstructed. See Nelson, 852 F.2d at 711. Nor is the issuance of a subpoena automatically proof of a pending grand jury investigation. As we wrote in Nelson:

> Fed. R. Crim. P. 17(a) provides for issuance of subpoenas "signed and sealed but otherwise blank to a party requesting it, who shall fill in the blanks before it is served." Because these subpoenas are issued without meaningful judicial oversight, the pendency of a grand jury investigation cannot be determined from their face alone. Not every investigation in which grand jury subpoenas are used ripens into a pending grand jury investigation for purposes of 18 U.S.C. S 1503.

Id.

Thus, the government must show something more than that a grand jury exists in the district and that subpoenas have issued in order to prove that a judicial proceeding is pending. We have refused to make rigid rules about how the connection between an investigation and a grand jury must be shown so as to avoid meaningless formality, see

11

Walasek, 527 F.2d at 678, but the record in this case is devoid of any evidence of such a connection. There is no testimony that the subpoena was issued in furtherance of an ongoing or presently contemplated presentation of evidence to the grand jury. We cannot, consistent with our precedent, find Agent Delia's testimony about the subpoena sufficient to sustain Davis's conviction.

There is another fundamental flaw in the government's case. A person who lacks knowledge or notice of a pending proceeding necessarily lacks the intent to obstruct that proceeding. See Aguilar, 515 U.S. at 599; Pettibone v. United States, 148 U.S. 197, 206 (1893). The Aguilar Court explained that recent decisions of the appellate courts have placed certain boundaries on S 1503's apparently broad sweep. For example, the defendant's action "must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority." Aguilar, 515 U.S. at 599 (citing Brown, 688 F.2d at 598)."[I]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct." Id.

The government concedes that there is no record evidence that Davis had actual knowledge of a grand jury proceeding, but argues that the evidence was sufficient to support a conviction on the ground that Davis inferred that a grand jury investigation was pending. Davis knew that Sabol had been convicted in Georgia on serious drug charges and was facing a twenty-year prison term. He received assurances from a FBI agent that Sabol would serve a lengthy sentence. In light of the fact that Davis was a police officer, the District Court found that there was a sufficient basis to conclude that Davis knew or believed that Sabol was only out of prison because he was an informant or cooperating witness in some federal investigation. Indeed, Davis communicated this belief to Michael and Vittorio, and, in the District Court's view, the jury could take him at his word, even though he later claimed that he was just bluffing to get Sabol out of his life.

12

The District Court concluded that Davis's failure to take proper police action from December 25, 1993 (when he first learned about Sabol's link to Vittorio), through March 4, 1994, justified an inference that Davis knew that Sabol was involved in an ongoing investigation. The District Court believed that Davis should have reported Sabol and Vittorio's illegal activities to his superiors, and that, when he did not, a jury could infer that he believed that Sabol was working for the government.[2] At the very least, the District Court held, the jury could have found that Davis was willfully blind to the likelihood that Sabol was involved in an investigation. Moreover, the jury could have concluded that Davis knew that his actions had the natural and probable effect of interfering with a federal investigation. As Vittorio testified, but for Davis's actions, he and other members of the Giampa crew would have continued to deal with Sabol.

The District Court's reasoning is sound, but it fails to go far enough to show Davis's knowledge of a grand jury investigation. There was no evidence that Davis concluded that Sabol was involved in a grand jury–based investigation. Agent Geer and Davis's superior, Larry Wirsing, both testified that a police officer would likely conclude that a person in Sabol's situation was or had been an informant. Both men formed the impression that Davis had reached this conclusion, though nothing explicit was said. But informants and investigations exist without grand juries. We cannot find in this record a shred of evidence that Sabol's status as an informant would have led Davis to conclude that Sabol was involved in an investigation related to a pending grand jury proceeding.

_____

2. The District Court also noted that Davis reported his contacts with Vittorio to his supervisor, Larry Wirsing, on March 4, 1994. At that point, Wirsing and Davis contacted FBI Agent John Truslow. The court found that the jury could have viewed Davis's contacts with authorities as another attempt to rid himself of Sabol's presence. While this behavior is probative of Davis's underlying motive, it is inconsistent with
a belief that Sabol was an informant; if Sabol were an informant, the government would not have any reason to rearrest Sabol for associating with Vittorio.

13

In United States v. Frankhauser, 80 F.3d 641 (1st Cir. 1996), the defendant took a number of acts to cover up evidence of hate crimes. The evidence clearly showed that he was aware of an FBI investigation into the crimes. The court, after scouring the record, found no evidence that the defendant knew or had notice of the pending grand jury proceeding. The government offered two pieces of evidence to meet its burden. The first was a misstatement by the defendant that he expected the FBI investigator to return "with a subpoena or search warrant," when it was clear that he meant to say "search warrant." In addition to finding that this was an irrelevant misstatement, the court also held that, even if the defendant was referring to a subpoena, there was no way to infer from this statement that he knew that a grand jury proceeding was underway, rather than merely a future possibility. See id. at 650. The government's second piece of evidence was similar to the government's evidence in this case: A witness testified that the defendant knew that the crimes were under "investigation." The court found that "we see no way the jury could have inferred that the investigation was by a grand jury rather than by the FBI." Id. Frankhauser, which we find persuasive, strongly supports Davis's argument, as it clearly distinguishes simple awareness of a federal investigation from knowledge of a pending judicial proceeding.

The only relevant case from this circuit involves police officers who beat a civilian to death and then took actions to cover up their misbehavior. See United States v. Messerlian, 832 F.2d 778 (3d Cir. 1987). The defendants argued that there was no evidence that they could have foreseen that federal judicial proceedings were in the offing when they committed their obstructive conduct. We found that the defendants, ten- and twenty-five-year veterans of the New Jersey State Police, could, by reason of their positions, be expected to know that federal grand jury investigations often follow when an arrestee dies suspiciously in police custody. See id. at 794 n.23. By contrast, we do not think that a police officer, particularly a transit police officer, should ordinarily expect that an informant is involved with a grand jury investigation, and the government offered no testimony to the contrary. Intent

14

to influence an investigation, which the evidence clearly supports, is insufficient to sustain a conviction under S 1503. See Aguilar, 515 U.S. at 599.

The government's proof in this case is deficient in two respects: First, it failed to show that the NYNEX subpoena was issued pursuant to a presently contemplated presentation of evidence to a grand jury. Second, it failed to show that Davis had the requisite knowledge that a grand jury investigation, as opposed to an investigation by federal agents, was pending. Davis's conviction on this count must therefore be reversed.

B. Conspiracy to Obstruct Justice

Count 1 of the indictment charged conspiracy to obstruct justice in violation of 18 U.S.C. S 371. The sufficiency of the evidence in a conspiracy prosecution requires close scrutiny. See United States v. Schramm, 75 F.3d 156, 159 (3d Cir. 1996). In order to prove a conspiracy to obstruct justice, the government must establish that there was an agreement whose object was to obstruct justice, that the defendant knowingly joined it, and that at least one overt act was committed in furtherance of the object of the agreement. See United States v. Mullins, 22 F.3d 1365, 1368 (6th Cir. 1994). Circumstantial evidence may be used to prove all the elements. See United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986). It is the first element--the existence vel non of an agreement to obstruct justice--that is in issue here.3

_____

3. The lack of evidence that a grand jury proceeding was pending is not dispositive on this count. In Perlstein, there was a conspiracy surrounding an illegal still. The conspiracy to suppress evidence and keep potential witnesses away from any investigating agency began more than two years before any judicial proceeding began. The indictment alleged overt acts both before and after the grand jury began to investigate. We assumed that the substantive offense of obstruction of justice could not have been committed at the inception of the conspiracy, but held that the defendants could still be charged with conspiracy to obstruct justice to be administered in the federal courts in the future. We suggested that conspirators who "expect or fear" that federal proceedings will be instituted can be prosecuted for conspiracy to obstruct justice. Perlstein, 126 F.2d at 795.

15

The District Court ruled that the evidence that Davis had informed Vittorio, Michael, and Maria of the Customs investigation and of Sabol's status as a confidential informant was sufficient to establish that he conspired with others to obstruct justice. The evidence spins out as follows: Michael and Maria had a relationship with Vittorio, and Davis first convinced them that Sabol was an informant, then got them to arrange a meeting between Davis and Vittorio. Davis provided Michael and Vittorio with information about Sabol's Georgia conviction, including the names of an FBI agent and an AUSA involved in the case, and told Vittorio that Sabol had received a twenty-year sentence, making it impossible for him to be out on work release. He told Vittorio that Sabol was cooperating with the government and that the cell phones that Sabol gave to Vittorio, McManus, and Giampa were tapped. The taped conversations from January 25 to March 2 corroborated Vittorio and Michael's testimony.

It is clear that the parties involved in this intrigue had different motives. Vittorio wanted to protect his confederates and himself; Davis wanted to hurt Sabol; Michael wanted to please Maria by helping her brother with his personal problems, and he also wanted to protect his childhood friend. Davis contends that this disproves a conspiracy. We disagree. If they all agreed to interfere with a pending judicial proceeding, they are guilty of conspiracy. That is the difference between motive and intent.

A conspiracy requires agreement between at least two people to the illegal object of the conspiracy, though other

_____

It is unclear to what extent this 1942 decision survives Aguilar, since much of the conduct alleged in Perlstein probably would fail Aguilar's nexus test, which requires that an obstructive act be likely to interfere with a grand jury rather than simply likely to interfere with an investigation. More importantly, however, Perlstein concerned a situation in which a jury could find that the defendants contemplated a federal investigation, and the defendants admitted that they knew of the grand jury investigation once it began. See Perlstein, 126 F.2d at 795. Perlstein does not change the requirement that there has to be some proof that the conspirators knew of or anticipated a grand jury investigation.

16

participants need not be indicted. See United States v. Delpit, 94 F.3d 1134, 1150 (8th Cir. 1996); United States v. Krasovich, 819 F.2d 253, 255 (9th Cir. 1987). The critical flaw in the government's case is that there is no evidence in the record that any of Davis's alleged coconspirators had the necessary awareness of a pending or threatened judicial proceeding. In United States v. Molt, 615 F.2d 141 (3d Cir. 1980), we reversed a conspiracy conviction because, while there was overwhelming evidence that the defendant violated the substantive law, there was insufficient evidence of his alleged coconspirators' knowledge. "[W]hen knowledge is an essential element of the underlying substantive offense, it must be proven that all co-conspirators possess the requisite knowledge." Id. at 146. That is, a person cannot conspire with himself; at least two conspirators must have sufficient knowledge in order for there to be a conspiracy.

Molt's requirement is not met here. The government relied on Davis's status as a police officer to argue that he was aware of the pendency of a judicial proceeding. We have already rejected that conclusion, and none of the other alleged coconspirators were police officers. Two actually testified: Vittorio and Michael. Both testified for the government, though Michael was something of a hostile witness, and neither testified about his knowledge of a pending or foreseen judicial proceeding. While Vittorio was clearly a wrongdoer, and Michael and Maria no doubt knew that Davis's actions were not legitimate, we cannotfind any evidence that would allow a reasonable jury to conclude that they conspired to obstruct a judicial proceeding. Cf. Schramm, 75 F.3d at 160 (a defendant could not be convicted of conspiracy to commit mail fraud where there was no evidence that the defendant knew of the mail fraud, though he knew of many other illegal acts by his alleged coconspirators). Therefore, Davis's conspiracy conviction must also be reversed.

C. Use of a Telephone in Furtherance of an Unlawful Act

Counts 5-11 charged Davis with use of a telephone in aid of racketeering in violation of 18 U.S.C. S 1952, which provides in relevant part that

17

> [w]hoever . . . uses any facility in interstate or foreign
> commerce, with intent to . . . promote, manage, carry
> on, or facilitate the promotion, management,
> establishment, or carrying on of any unlawful activity,
> and thereafter performs or attempts to perform [any of
> the acts specified commits an offense against the
> United States].

The "unlawful activity" charged is a violation of New York
Penal Law S 200.25, receiving reward for official
misconduct:

> A public servant is guilty of receiving reward for official
> misconduct in the second degree when he solicits,
> accepts or agrees to accept any benefit from another
> person for having violated his duty as a public servant.

Under New York law, "benefit" is defined to include "any
gain or advantage to the beneficiary and includes any gain
or advantage to a third person pursuant to the desire or
consent of the beneficiary." N.Y. Penal LawS 10.00(17)
(McKinney 1988), and the court so instructed the jury. The
law does not require an agreement between the two parties,
as the law against bribery does; it only requires a past
violation of duty and a solicitation or acceptance of a
benefit for the violation.

The critical issue is whether Davis, a New York police
officer at the relevant times, solicited a "benefit" within the
meaning of the statute. The government's theory was that
any harm to Sabol benefited Davis, whether in the form of
Sabol's return to prison or Sabol's murder. Davis made a
phone call to Pelatti's residence on February 18, 1994, that
suggested that he perceived Sabol's presence as impeding
his attempt to reconcile with Pelatti, and the government
argues that his hope of ending Sabol's newfound freedom
was a sufficient "benefit."

Although the New York Court of Appeals has not
construed Penal Law S 200.25, the extant case law suggests
that the government's theory of benefit goes too far. In
People v. Hyde, 141 N.Y.S. 1089 (App. Div. 1913), the
defendant, who had authority to deposit city money in
banks, asked a bank manager to extend a loan to a friend
of his, in return for which the defendant promised that he

18

would increase the amount of city funds on deposit at the manager's bank. He was charged with receiving a bribe. The court concluded that he could not be convicted of that crime because there was no showing of any "personal advantage" to him.

The Hyde court rejected a prosecution theory similar to that proffered in this case, which is that the defendant's request for something is proof enough that getting it would be a "benefit" to him:

> The People . . . contend[ ] that the mere fact that Robin, for the Northern Bank, acceded to defendant's request that that bank should make the loan desired by the Carnegie Trust Company, of itself constituted a bribe and was manifestly a personal advantage and thing of value to defendant, and so the court charged as matter of law. It is quite clear that this position is untenable. It is not to be disputed that . . . what is commonly known by the collective word "bribe," is something more than the personal satisfaction arising from the gratification of a wish. There must be something more flowing to the person who asks the favor--something of value to him, not necessarily of pecuniary or intrinsic value, but value in the sense of a personal advantage of some sort. The word "advantage" must be given its commonly accepted and natural meaning of something accruing to the benefit of the person receiving it.
>
>  . . . . [A bribe] must consist of something real, substantial and of value to the receiver, as distinguished from something imaginary, illusive, or amounting to nothing more than the gratification of a wish or hope on his part.

Id. at 1093 (emphasis added). Hyde is still commonly cited in prosecutions under section 200.25 and related laws.

The most recent relevant case is People v. Feerick, 671 N.Y.S.2d 13 (App. Div. 1998). The majority sustained convictions under section 200.25 where the defendants, who were police officers, had committed various abuses of authority in their search for a lost police radio. The majority concluded that the return of the radio was "a specific, personal benefit to these defendants as well as a benefit to

19

the Police Department." Id. at 21–22. The radio was being used by drug dealers in the area both to taunt the police and to monitor their activity, causing the officers embarrassment and jeopardy. See id. at 22. The case produced a vigorous dissent, which argued that the radio was only tenuously connected to the officers and that the enjoyment of its return was an insufficient benefit under the statute.

The government argues that the majority opinion in Feerick supports its theory because retrieving the radio offered psychic benefits to the officers--the satisfaction of getting the radio back. Similarly, it argues, telling Vittorio about Sabol offered Davis the psychic benefit of harming Sabol. But Feerick did not turn on the defendants' nonpecuniary motives for seeking the radio; under the statute, a public servant is guilty if he solicits an item with de minimis market value but great personal value. The question is whether we can find anything sufficiently well-defined here that we might identify as a "benefit."

Other cases emphasize that a "benefit" must be definite in some way, although it need not be tangible. In People v. Dolan, 576 N.Y.S.2d 901 (App. Div. 1991), the defendant, a police officer, was accused of attempted bribery and attempted bribe receiving for threatening to stop transporting prisoners of a separate police jurisdiction to the County Jail unless the Sheriff of the other jurisdiction agreed to limit investigations by his department in the defendant's jurisdiction. The prosecution argued that the "benefit" sought by the defendant was "a lessening of the possibility of discovery of alleged drug use by defendant and his friends." Id. at 904. The court rejected this theory and dismissed the charge. The court found that the benefit was not "real, substantial and of value," but was rather "imaginary, illusive or amounting to nothing more than the gratification of a wish or hope." Id. (citing Hyde).

The Dolan court also dismissed a charge that the defendant received a benefit from agreeing to refrain from prosecuting a woman. The alleged benefit was that, in return for his forbearance, she would become a confidential police informant. The prosecution argued that the"benefit" was that the defendant got a personal relationship with the

20

informant so that she would give him information about undercover Sheriff's operations relating to drug use by him and his friends. The court found that "such a benefit would be highly speculative and consist only of a remote wish or an illusive hope on his part." Id.

In People v. Esposito, 554 N.Y.S.2d 16 (App. Div. 1990), the chief of the Metro North Railroad Police conducted an unauthorized criminal record check on a company employee, in violation of his duty as a public servant. The alleged "benefit" was the utility to his employer of knowing relevant information, but the court found that this was too ill-defined to fall within the statutory prohibition. Likewise, in People v. Cavan, 376 N.Y.S.2d 65 (Sup. Ct. 1975), the defendant was charged with bribery when, on his arrest, he offered to assist the police in catching drug dealers in return for leniency. The court held that

> the benefit must not be so remote, abstract, or theoretical as to create speculation as to its ultimate value to the receiver. In the case at bar, it is doubtful if a vague offer to turn State's evidence, without anything further, constitutes such a benefit in the statutory sense.

Id. at 67.

In People v. Adams, 382 N.Y.S.2d 879 (County Ct. 1976), the defendant, a legislator, was part of a committee studying off-track betting. He prevailed upon an employee of a firm that had made a formal presentation to the committee to ghost-write a final report for the committee. The court found that the defendant had not received a "benefit" within the meaning of the penal law:

> "The gist of the crime of bribery is the wrong done to the people by corruption in the public service." Thus, the public servant who agrees to and does manipulate events, not to benefit himself or a third party, but for the personal satisfaction of commanding obedience, is said to receive no bribe.

Id. at 881 (citations omitted) (emphasis added). The court found that the supposed "benefit" was too nebulous to support a charge of receiving reward for official misconduct,

21

in that little credit would redound to him for the committee's report and there was no evidence that he benefited in any "direct material way."

We believe that the "benefit" here is too gossamer to fall within section 200.23. The government's theory would convert all violations of duty that involve at least one other person into violations of this statute. Under that approach, if an officer harasses a citizen, he or she receives the pleasure of having harassed the citizen, and that "benefit" comes (however unwillingly) from the citizen. If an officer declines to arrest someone when an arrest should occur, that person receives a benefit, and the benefit would be "pursuant to [the officer's] desire and consent," within the prohibition of the statute. (The statute does not require any particular relationship between the officer and the person benefited, so long as the benefit accrues pursuant to the officer's desire and consent.) Essentially, this theory converts Davis's violation of his duty into a "benefit" by virtue of his desire to violate his duty and his hope for satisfaction from doing so.

Where the alleged benefit consists of an intangible course of conduct, we think that it must be sufficiently specific to constitute a clearly defined and direct advantage to the defendant, or to a third party in whom he has some interest. Compare Dolan, 576 N.Y.S.2d at 404 (alleged benefit of lessened possibility of discovery of the defendant's other misconduct was insufficiently specific to fall within the statute), with People v. Hochberg, 404 N.Y.S.2d 161, 167 (App. Div. 1978) (a person's agreement not to run against the defendant in a primary election was a sufficiently direct benefit to constitute "personal advantage" to the defendant). It was the government's own theory that Davis wanted Sabol out of his life and did not care how, whether the mechanism was: (1) that Sabol's cooperation failed to produce results so that Sabol would return to prison; (2) that Sabol would be charged with violating his parole; or (3) that Sabol would be killed. Davis had no specific plan. We recognize that New York does not require a tangible benefit in order to find a violation of section 200.25, but we believe that the claimed benefit in this case is so intangible and speculative as to fall outside the reach of the statute.

22

The government has, however, a narrower theory, which it also argued to the jury: Davis wanted Vittorio to give him a gun in return for his damning information. Although the issue is close, we think that this is too tenuous a ground on which to uphold Davis's conviction. The link between the gun and the violation of duty is far more attenuated than what the New York courts seem willing to accept. In Feerick, for example, the only way for the officers to get what they wanted was to get the radio, while here receiving the gun was an incremental step in a possible plan to shoot Sabol, one of the least likely ways in which Davis could be rid of Sabol. The request was not part of an actual attempted murder, and it remained entirely hypothetical.

Moreover, Davis's request for a gun was not necessarily tied to his violation of duty, nor was it in any way tied to his status as a police officer. If Vittorio had already known about Sabol's status, Davis could just as readily have asked for the gun, and Vittorio would have had as much reason to give it to him to "take care" of Sabol. In this instance, Davis acted like an obsessed person, not a corrupt police officer. Thus, we conclude that Davis's convictions for violating S 1952 must be set aside.

D. Witness Tampering

1. Introduction

Davis was also charged with witness tampering in violation of 18 U.S.C. S 1512(b):

> Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . . shall be fined under this title or imprisoned not more than ten years, or both.

Unlike S 1503, S 1512 does not require an official proceeding to be pending or imminent at the time of the offense. A reasonable belief that the named witness will

23

communicate information to a law enforcement officer is enough to create liability under the statute. See United States v. Kozak, 438 F.2d 1062, 1066 (3d Cir. 1971). As discussed above, a reasonable jury clearly could have found that Davis believed that Sabol was communicating with the authorities.

To be criminally liable, the defendant must know that his conduct has the natural and probable effect of interfering with the witness's communication, whether or not it succeeds. See United States v. Kenny, 973 F.2d 339, 344 (4th Cir. 1992). Davis indicated that he wanted Vittorio to stop dealing with Sabol and warned Vittorio that Sabol was "setting him up." He also hoped that Vittorio would kill Sabol. The government argues that the natural, foreseeable, and probable consequence of Davis's acts was that Sabol would be killed or otherwise prevented from gaining and conveying information. Although we find the government's theory extremely broad, we conclude that Davis's conduct in this case falls within the statutory meaning of "corrupt persuasion."

Simply interfering with the flow of information to the government is not enough to constitute witness tampering. Suppose that Vittorio became suspicious of Sabol on his own and stopped talking to him, thus decreasing the amount of information Sabol could communicate to the government. By the government's theory, this would apparently constitute witness tampering by Vittorio. Or hypothesize that Michael tried to dissuade Vittorio from his criminal ways, using as one of his arguments the proposition that the government had infiltrated the Giampa Crew. By the government's theory, this would apparently constitute witness tampering by Michael. Indeed, a lawyer's instruction to a client not to speak to potential government witnesses, including government investigators, would also apparently constitute witness tampering by this theory, except that the statute excludes lawful, bona fide legal services in connection with or anticipation of an official proceeding. See 18 U.S.C. S 1515(c). A defendant's husband or mother, however, would not fall within this safe harbor if he or she advised a defendant to keep silent when approached by potential witnesses.

24

Our rejection of the government's broad theory has a basis in the statute. Because there is no allegation that Davis used misleading conduct,4 intimidation, physical force, or threats, we limit our inquiry to whether he engaged in "corrupt persuasion" with the relevant intent.

## 2. Corrupt Persuasion

The Ninth Circuit has held that lying to a witness is not corrupt persuasion, though appealing to a witness to avoid testifying truthfully in order to protect one's career would be. See United States v. Aguilar, 21 F.3d 1475, 1485–86 (9th Cir. 1994) (en banc), rev'd on other grounds, 515 U.S. 593 (1995). United States v. Poindexter, 951 F.2d 369 (D.C. Cir. 1991), gives more guidance on the meaning of corrupt persuasion. Poindexter interpreted 18 U.S.C.S 1505, which prohibits obstructing proceedings before congressional committees. Poindexter was charged with obstruction of justice for lying to Congress, which the government argued was "corrupt persuasion." The majority held that the term could not be extended to encompass simple lying to a congressional committee.

As the court explained, "corruptly" has two possible meanings, transitive and intransitive. The transitive meaning would involve persuading another by means of corruption or bribery, while the intransitive would involve persuading "wickedly" or "immorally," that is, with a bad motive. Poindexter endorsed the transitive meaning in order to avoid what it perceived as a potentially unconstitutional vagueness, and also because the other terms in the statute were transitive ("by threats," "by force," etc.). It further found that "corrupt persuasion" could not be cabined simply by saying that the term covered "influencing another to act `immorally' or `improperly,' " as that simply substitutes one indefinite term for another.

_____

4. Several courts have held that asking a witness to tell what he knows to be a lie is not misleading conduct because there is nothing misleading about a request to lie. See, e.g., United States v. Kulczyk, 931 F.2d 542, 546 (9th Cir. 1991); United States v. King, 762 F.2d 232 (2d Cir. 1985). The government has not identified any way in which Davis's conduct was misleading. Indeed, on the government's own theory he told the truth as he perceived it: Sabol was an informant. If asking for a lie is not misleading to the target, surely telling the truth is not.

25

The Poindexter court determined that corrupt persuasion is " `corrupting' another person by influencing him to violate his legal duty," id. at 379, and that the "core" of the statutory prohibition of corrupt persuasion was aimed at a person who, "for the purpose of influencing an inquiry, influences another person (through bribery or otherwise) to violate a legal duty," id. at 385. See also United States v. Morrison, 98 F.3d 619, 630 (D.C. Cir. 1996) (influencing a witness to violate her legal duty to testify truthfully constituted corrupt persuasion under S 1512(b)).

We approved of Poindexter's reasoning in the S 1512 context in United States v. Farrell, 126 F.3d 484 (3d Cir. 1997). Farrell was convicted of witness tampering for attempting to dissuade a coconspirator from providing information to federal investigators about Farrell's involvement in a conspiracy. We reversed his conviction:

> Without any definitional assistance, we find the phrase "corruptly persuades" to be ambiguous. We agree with Farrell that the phrase cannot mean simply "persuades with the intent to hinder communication to law enforcement" because such an interpretation would render the word "corruptly" meaningless.

Farrell, 126 F.3d at 487. While we were confident that bribing someone to withhold information or persuading someone to provide false information would be corrupt persuasion, we declined to define the term more abstractly. See id. at 488. Farrell concluded that the statute did not cover a noncoercive attempt to persuade a coconspirator who had a Fifth Amendment right not to disclose information about the conspiracy to refrain, in accordance with that right, from volunteering information to investigators. See id. at 488.5

The government argues that Farrell is distinguishable because the defendant in that case was acting in furtherance of his own interest in avoiding a coconspirator's disclosure of a crime, while here Davis was a malicious

_____

5. We declined, however, to resolve whether discouraging the testimony of a potential witness who did not possess a Fifth Amendment privilege of his or her own would violate S 1512. See Farrell, 126 F.3d at 489 n.3.

26

interloper. While we agree that Davis may have violated S 1512(b), see infra, we caution that Davis's malicious purpose to expose an informant is insufficient under Farrell to justify a conviction:

> We read the inclusion of "corruptly" in S 1512(b) as necessarily implying that an individual can "persuade" another not to disclose information to a law enforcement official with the intent of hindering an investigation without violating the statute, i.e., without doing so "corruptly." Thus, more culpability is required for a statutory violation than that involved in the act of attempting to discourage disclosure in order to hinder an investigation.

Id. at 489.

Davis may be properly convicted under S 1512(b) because there was testimony that he suggested that Vittorio should kill Sabol and asked Vittorio for a gun so that Davis himself could kill Sabol. By suggesting that Vittorio should "do something" about Sabol or get Davis a gun, Davis urged Vittorio to violate his legal duty not to kill Sabol or aid in Sabol's death. This conduct would constitute "corrupt persuasion" under the statute. The fact that Davis never had direct contact with Sabol is irrelevant, because all that is required under S 1512(b) is that a defendant corruptly persuade "another person" with the requisite intent. That person need not be the witness. Moreover, Vittorio's testimony that he was never persuaded to kill Sabol does not exonerate Davis. If Davis intended to corruptly persuade, his attempt violates the statute.6

_____

6. Although Davis does not raise the issue, we note that the District Court's instruction on corrupt persuasion does not track Farrell. The Court instructed the jury that "[t]he word `corruptly' means having improper motive or purpose of obstructing justice." SA at 1426. Farrell and Poindexter suggest that this instruction provides insufficient guidance to the jury, as anyone with the intent to interfere with an investigation has "improper" motives. On remand, the Court should clarify that "corrupt persuasion" involves more than an improper motive, and includes inducements to violence.

III. The Intoxication Instruction

Having decided that there is sufficient evidence for a conviction under S 1512(b), we turn to the question whether Davis is entitled to a new trial because the District Court refused to provide an intoxication instruction concerning his specific intent. A defendant is entitled to an instruction on his theory of the case where the record contains evidentiary support for it. See Government of V.I. v. Carmona, 422 F.2d 95, 99 n.6 (3d Cir. 1970). A court errs in refusing a requested instruction only if the omitted instruction is correct, is not substantially covered by other instructions, and is so important that its omission prejudiced the defendant. See United States v. Smith, 789 F.2d 196 (3d Cir. 1986). We first consider whether Davis preserved the issue for appellate review, and then evaluate the merits of his request.

A. The Request for Instruction

When Davis's trial counsel initially raised the issue of an intoxication charge, the District Court was uncertain that such an instruction was required and requested briefing on the issue. The record reveals the following exchange on March 20, 1998, a Friday:

> Mr. Cascione: I made an additional submission which I gave Mr. Sierra, so if he wishes to cover it during his opportunity for an intoxication charge because I saw some reason for it as the proof came out.
>
> I will submit it to the Court so that the Court has it and we'll cover it in our charge conference.
>
> The Court: You better give me law on that.
>
> Mr. Cascione: That's understood.
>
> The Court: I need law on that. I'm not sure I see the basis for an intoxication charge here, but you can address that factually and legally. Give me these briefs Monday morning.

Over the weekend, however, there was an unexpected early spring snowstorm that disrupted much travel in the area; we take judicial notice of the snowstorm. See Elise Young & Barbara Williams, North Jersey Gets a Taste of

28

What Might Have Been: Winter Lands a Late Blow, Bergen County Record, Mar. 23, 1998, at A1 (stating that up to six inches fell in New Jersey, disrupting traffic). On Monday, March 23, 1998, defense counsel stated that the inclement weather had disrupted his research, and, when specifically asked about the intoxication charge, stated:

> I have the submission. I was prepared to give the Court citing from Blackmore [sic]. There is an Eighth Circuit case on it that I was not able to obtain yesterday.

The statement obviously refers to E. Devitt & C. Blackmar, Federal Jury Practice and Instructions, the veritable "bible" on the subject, which virtually every federal district judge has in his or her chambers.

The Court rejected the intoxication charge because defense counsel had not provided enough support for it:

> I told you I wanted something and you haven't given me anything. The stuff you have given me is not adequate.
>
> Now, you've got an intoxication argument, you haven't given me the charge, you haven't given me any law on it. I came in early to handle it. . . .
>
> I know the whole idea behind this is for you to "preserve this" and raise it now so you can bring it up on appeal and I have a real serious problem with that, and I'm going to have to address all this in an opinion with regard to this, which means again I'm going to have to be doing your work and I don't think I should have to do your work.

The District Court never ruled that an intoxication charge was not justified by the facts; rather, it apparently rejected the charge because of counsel's failure to brief the issue.

The government's appendix contains defense counsel's written request to give an intoxication instruction, along with excerpts from Devitt & Blackmar relevant to intoxication. The government and the defendant cannot agree on whether these papers were in fact submitted to the District Court.7 We need not resolve the conflicting

_____

7. The government argues that these papers were never submitted to the District Court, and that the Court's subsequent reference to defense

29

accounts, because we conclude that Davis's counsel brought the intoxication issue to the Court's attention with sufficient clarity to preserve the issue, even assuming that he did not provide the Court with any written submission.

The government argues that Davis waived the issue by failing to brief it to the District Court. Waiver, however, is an intentional relinquishment of a known right. See United States v. Goldberg, 67 F.3d 1092, 1099 (3d Cir. 1995). Davis's counsel did not relinquish his request for an intoxication instruction, though he failed to supply the court with precedent in support of his request. We are persuaded that the appropriate inquiry is whether defense counsel's acts preserved the issue for appellate review. See United States v. Russell, 134 F.3d 171, 178–79 (3d Cir. 1998).

In general, if an instruction is timely requested, is supported by the evidence, and correctly states the law, it should be given. See, e.g., United States v. Jerde, 841 F.2d 818 (8th Cir. 1988); United States v. Hicks, 748 F.2d 854 (4th Cir. 1984). However, counsel is required to draw the court's attention to a specific instruction, or to a problem with an instruction, in order to put the court on notice so that a possible error may be corrected before the jury begins to deliberate. See United States v. Scarpa, 913 F.2d 993, 1020 (2d Cir. 1990); United States v. Kaplan, 832 F.2d 676, 682 (1st Cir. 1987). As we have explained:

> The specificity requirement imposes a strict standard
> on defense counsel, but it is not a mere formalism.

_____

counsel's Devitt and Blackmar excerpts referred to materials submitted in response to other portions of the proposed charge. See SA at 1288 (District Court refers to excerpts from Devitt & Blackmar and Aguilar submitted by defense counsel). The government submits that it included the proposed intoxication charge in the appellate record, despite the fact that it was not presented to the District Court, in order to avoid any appearance of concealing relevant material. Davis's appellate counsel, who did not represent Davis at trial, takes the position that the instruction was submitted to the Deputy Court Clerk on the morning of March 23, 1998, and was properly included in the appellate record. Davis's trial counsel offered to submit an affidavit to this effect, but we have found it unnecessary for him to do so.

> Without a clearly articulated objection, a trial judge is not apprised sufficiently of the contested issue and the need to cure a potential error to avoid a new trial.

Government of V.I. v. Knight, 989 F.2d 619, 631 (3d Cir. 1993).

At the same time, the requirement that counsel make specific requests is not designed to be a trap. Our cases suggest that a request for an instruction need only be sufficiently clear to enable the trial judge to fairly evaluate it. In United States v. Werme, 939 F.2d 108 (3d Cir. 1991), for example, one of the government's witnesses had pled guilty to receiving the very bribe for which the defendants were on trial for giving. We held that the following statements constituted a sufficient request for a limiting instruction against using the guilty plea as evidence of the defendant's guilt:

> [I]f they introduce that specific conviction, we're entitled to an instruction at a later time as far as the weight that should be given that. . . . The fact that he entered a plea to a bribery transaction involving $3,000 cannot be used to infer that we were guilty of paying the bribe.

Id. at 114. We note that counsel in Werme did not cite any precedent to justify his request. Werme nonetheless found that counsel had clearly taken issue with the offered evidence and requested a curative instruction. See id. at 115; see also Russell, 134 F.3d at 178-79 & n.4 (the purpose of federal rules governing jury instructions is to give a trial court "notice of potential error" and "the underlying basis for the objection" rather than to force parties to follow formal or technical requirements); United States v. Kwong, 14 F.3d 189, 195 (2d Cir. 1994) ("While the objection could certainly have been more focussed, we find that it was sufficient to alert the trial court and the government to the serious Braxton violation they were about to commit.").

The events in this case raise the question of the proper allocation of responsibility between lawyer and judge. A judge should require counsel to participate in the process of crafting instructions. However, the issue here is not

31

arcane. Indeed, not only is the appropriate instruction set forth in Devitt & Blackmar, an instantly available source for any federal trial judge, but there appears to be no dispute as to the substance of the law: Intoxication is a defense when a defendant's intoxication prevented him from possessing the mental state necessary to commit the crime with which he is charged.

On a garden-variety issue such as intoxication, where an adequate instruction is available in a standard charge book, the trial court cannot leave everything to the lawyers. The judge has an immanent obligation to research the law and craft an appropriate charge. This obligation cannot be avoided by requiring the lawyers to file legal memoranda on a pedestrian issue and then considering them not to have preserved the issue if they do not. If the requested instruction were complex and involved subtle questions of law, the situation would be different and the lawyers would have the laboring oar, but in this case we are unwilling to deem the request unpreserved merely because defense counsel did not present the Court with a copy of the Devitt & Blackmar charge.

There is a dispute, discussed infra, as to whether the record supported the request for an intoxication instruction. That is certainly a basis for requiring memoranda. However, there was a snowstorm that interfered with counsel's ability to present material to the District Court. Moreover, that aspect of the matter could have been argued on the basis of the record, which was fresh in everyone's mind. We do not believe that criminal defense counsel who are immersed in trying a complex case should be deemed to have failed to preserve an issue of this sort for neglecting to produce memoranda over a weekend, even without a snowstorm. While far from perfect, defense counsel's request was straightforward and required consideration on its merits. In these circumstances, we conclude that Davis's counsel properly preserved the issue for our review by making his request for an intoxication instruction clearly and specifically, even though he failed to provide precedent in support of the proposed instruction. Cf. Russell, 134 F.3d at 178 n.4 (adopting a"flexible, common-sense interpretation" of the rules for preserving objections to proposed instructions).

32

B. Was the Instruction Justified?

All of the charged crimes were specific intent crimes, and intoxication can negate specific intent. See United States v. Williams, 892 F.2d 296, 303 (3d Cir. 1989). Davis argues that he was drunk at the relevant times--his January 25 and March 2 meetings with Vittorio--and indeed all witnesses agree that he was drinking heavily on those dates.

Michael testified that, immediately before Davis saw Vittorio on January 25, Davis was "ossified . .. . [d]runk beyond drunk, slurring, he walked in with two bottles of wine." Michael's testimony indicated that Davis was drunk and slurring throughout the part of the conversation that he witnessed. On his part, Vittorio testified that when he first saw Davis on January 25, "he had some jeans on with no shirt and he seemed a little disheveled. He seemed very paranoid." Vittorio and Davis then went to a bar, Jester's Pub in Yonkers, to continue the conversation away from Maria and the Lanteris' baby, and it was at the bar that Davis suggested that Vittorio "do something about" Sabol and that Vittorio should get Davis a gun. Vittorio testified, however, that Davis did not seem drunk to him. Davis himself testified that he was drinking before he called Michael and that he brought bottles of wine to the Lanteris' apartment. He described himself as drunk throughout the conversation with Vittorio, "rambling," and using "what was left of my brain."

Vittorio testified that the March 2 meeting was similar. They went to Jester's Pub, where Davis again asked for a gun. Davis had more than one drink (vodka and lime) during the conversation and Vittorio testified that he "already had a few drinks in him before he met me. . . . He wasn't staggering, because I know he does drink a lot so he probably can handle a few drinks. He was a little buzzed, definitely by the time I left by the way he was driving." After the discussion, Davis drove Vittorio home, and Vittorio testified that "he had a few drinks and he was all over the road and I was kind of concerned about him. . . . I remember calling [Michael], telling him that Vinnie [Davis] was really drunk and I was worried that he might crash and kill himself or something . . . ." Finally, Vittorio stated

33

that "Vinnie was very drunk" at the end of their conversation. Davis likewise described himself as "hammered" and "very, very drunk" on March 2.

In order to justify an intoxication instruction, most courts have held that a defendant needs more than evidence of intoxication. He also needs some evidence of interference with his ability to form the relevant intent. See, e.g., United States v. Nacotee, 159 F.3d 1073, 1076 (7th Cir. 1998); United States v. Washington, 819 F.2d 221, 225 (9th Cir. 1987). In Government of the Virgin Islands v. Carmona, supra, however, we apparently set forth a different rule, as we found an intoxication instruction required in a felony murder case when the only evidence of intoxication was that the defendant had a large amount to drink.

The government argues that our Carmona holding was dicta because we reversed the defendant's conviction on the alternate ground that the jury instructions failed to define robbery as a specific intent crime. However, we specifically found the jury instructions defective in that they failed to explain the materiality of the intoxication evidence. Furthermore, the errors in the intoxication charge and the robbery charge were interrelated, because they both required the jury to be informed about specific intent. We rejected the government's claim that, because there was evidence only of intoxication and not of interference with the defendant's thinking, no intoxication instruction was required. See Carmona, 422 F.2d at 99 n.6. We reversed because of the "errors in the charge to the jury." Id. at 101.

It may be that our rule is not substantially different than that of other circuits, in that it is often difficult to determine what might qualify as evidence of interference with ability to form intent. Carmona endorses the conclusion, justified by much human experience, that heavy drinking may interfere with a person's ability to form a specific intent. The facts in Carmona--in which the defendant was drinking heavily in a bar, left for a few minutes, and then returned to rob it--suggested that the crime could have occurred without the defendant forming a specific intent to rob.

34

At all events, in Carmona, the evidence justifying the instruction was weaker than it is here, because the only testimony in Carmona was that the defendant was drinking, and the witnesses refused to say that he behaved in a drunken manner. By contrast, Michael testified that Davis was "drunk beyond drunk," and Vittorio testified that Davis was drunk and paranoid at their first meeting on January 25, 1994. Vittorio was so concerned about Davis's drunken driving on March 2, 1994, immediately after their second meeting, that he called Michael to express his concern. While the government notes that a jury could conclude that Davis was not drunk at the beginning of the March 2 conversation, there was also evidence from which a jury could conclude that Davis was significantly affected by alcohol at the time of the critical statements.

The government argues that there was no need for an instruction because Davis's drinking clearly did not interfere with his ability to form the specific intent to commit the charged crimes. It maintains that Davis's scheme evolved over some period of time, and that he committed his crimes over many weeks. Despite his drunkenness, Davis initiated meetings with Vittorio in order to explain to him why he should not trust Sabol. While drunk, Davis told Vittorio that Sabol was a "rat," thus evidencing that his soused mind retained this crucial fact and that he knew that telling Vittorio would further his objective.

The evidence plainly showed that Davis had a fairly complex plan to eliminate Sabol from his (Davis's) life. Yet Davis's plan to eliminate Sabol from his life did not, in the main, involve witness tampering; the witness tampering was only a small part of the plan, which was in other respects not unlawful. As we have explained, an intent to expose a person as an informant, while reprehensible, is insufficient to constitute "corrupt persuasion" under the statute. Thus, Davis's implacable hatred for Sabol and his consistent intent, held drunk and sober, to expose Sabol as a "rat" was insufficient to make him guilty of witness tampering.

To violate the statute, Davis had to intend to corruptly persuade. The two instances of corrupt persuasion, on

35

January 25 and March 2--asking for the gun and suggesting that Vittorio harm Sabol--did not permeate his discussions with Vittorio, and a jury could have believed that Davis blurted them out drunkenly without intending that his requests should be acted upon. Unlike his hatred for Sabol, his acts of corrupt persuasion were not so extensive as to make the intoxication defense implausible.

A jury could also find that Davis possessed the requisite intent despite his drinking. But, to uphold Davis's conviction, we would have to find that the missing instruction was harmless error--that "it is highly probable that the error did not contribute to the judgment." Murray v. United of Omaha Life Ins. Co., 145 F.3d 143, 156 (3d Cir. 1998). We cannot say that the error was harmless on this record. See also United States v. Logan, 717 F.2d 84, 92 (3d Cir. 1983) (reversing for plain error where the trial judge had notice of the defense request for an instruction and the evidence showed that the instruction was critical to the defense's theory). Therefore, we will reverse Davis's conviction for witness tampering and remand for a new trial.

IV. Evidentiary Issues

Davis claims that the District Court abused its discretion in admitting testimony that he had been found guilty by the police department of the same acts for which he was on trial, and also abused its discretion in admitting evidence of other, unrelated misconduct. He contends that this evidence's prejudicial effect outweighed its probative value in contravention of Rule 403. Because we are remanding the witness tampering charges for retrial, we will evaluate the challenged evidentiary rulings. We will only disturb a district court's decision on admissibility for abuse of discretion. See United States v. Donley, 878 F.2d 735, 737 (3d Cir. 1989).

The District Court allowed the prosecution to question Davis about his departmental conviction because Davis had testified about why he was dismissed from the police department on direct examination. He had testified that he was dismissed because Vittorio falsely claimed--in a

36

conversation with Michael that was recorded as part of the federal investigation and subsequently provided to NYPD investigators--that Davis had allowed him (Vittorio) to fire Davis's police firearm. (Vittorio now concedes that this was a lie.)

The prosecution sought to show that Davis was being less than fully truthful about the reasons for his discharge. The prosecutor led Davis through a fairly lengthy recitation of the non-firearm-related departmental charges against him, which largely tracked those before the jury. 8 The court ruled that the questions were appropriate to challenge Davis's credibility, and instructed the jury to consider them only for impeachment purposes at the time of cross-examination.

In this case, Davis's answers implicated more than his credibility; they informed the jury that another body had already found Davis guilty of the conduct charged in the indictment, albeit only by a preponderance of the evidence. We note in this regard that Davis had not flatly lied when he testified that he was discharged over the gun incident, as that was one of the reasons for his discharge along with his other contacts with Vittorio.9 Thus, while probative of Davis's willingness to edit the full truth, the cross-examination was more prejudicial than ordinary cross-examination about a defendant's truthfulness with respect to collateral matters.

The government argues, however, that Davis "opened the door" to the challenged questions by testifying on direct examination that Vittorio's falsehood got him fired. We usually use that phrase in reference to a specific doctrine, "curative admissibility," which states that once a party has introduced inadmissible evidence that may create a false

_____

8. In addition to making essentially the same charges as those before the jury, the police department also charged Davis with lying to the FBI agents who had investigated the "leak."

9. The challenged questions did not serve to rehabilitate Vittorio, the government's witness, as the government apparently conceded that Vittorio had lied in the statement relied upon by the NYPD investigators and merely sought to show that there were additional reasons justifying Davis's discharge.

37

impression, an opposing party may thereafter introduce otherwise inadmissible evidence to rebut or explain the prior evidence. But the government does not argue that Davis's direct testimony was inadmissible or explain why it needed to rebut Davis's account of his termination. See United States v. Forrester, 60 F.3d 52, 60-61 (2d Cir. 1995); Government of V.I. v. Archibald, 987 F.2d 180, 187 (3d Cir. 1993). Therefore, this is not a case of curative admissibility.

The government may find more solace in the related principle of completeness, which states that when a witness testifies to part of a conversation, statement, transaction, or occurrence, the opposing party may elicit testimony on the whole thereof, to the extent that it relates to the same subject matter and concerns the specific matter opened up. See id. at 188; United States v. Womochil, 778 F.2d 1311 (8th Cir. 1985) (allowing the government to introduce otherwise inadmissible hearsay to rebut a false impression caused by defense counsel's elicitation of only part of the hearsay). However, it is still unclear why the facts behind Davis's termination were relevant to the government's case, no matter how incomplete Davis's explanation was.

At all events, the issue before us is whether the line of questioning was properly allowed to challenge Davis's credibility. We conclude that the District Court did not abuse its discretion in ruling that the prosecutor could ask Davis whether there were other reasons for his termination in order to show that Davis was unwilling to tell the full truth. See United States v. Copelin, 996 F.2d 379, 383 (D.C. Cir. 1993) (noting that the government may, when appropriate, explore a defendant's testimony on cross-examination in order to impeach him). Given that the jury was correctly instructed to consider this testimony only for impeachment purposes, the District Court did not abuse its discretion in permitting this line of questioning.

The other challenged testimony relates to Davis's prior bad acts. The prosecutor first questioned Davis about a forty-four-day suspension that he had received for misappropriating departmental gasoline for use in his personal vehicle and putting a false name in a gas log. Second, he asked Davis about an incident in which Davis was found to have taken a subway pass away from a young

38

man and ripped it up. During an Internal Affairs interview, Davis denied that he ripped up the pass, but another officer found the ripped-up pass and Internal Affairs determined that Davis had lied. Third, the prosecutor asked Davis about an incident in 1985 in which Davis was charged with improperly putting a gun to a prostitute's head. She claimed that Davis yelled at her, that she responded profanely, and that he then slammed her on the hood of his car and put a gun to her head. In response to the prosecutor's questions, Davis gave exculpatory accounts of his acts in those three instances.

Davis notes that, under Rule 404(b), evidence of other crimes or wrongs is inadmissible to prove personal disposition, i.e, character. It is only admissible for other purposes, including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. He argues that credibility is not a permissible 404(b) exception. However, under Federal Rule of Evidence 608(b), specific instances of conduct may be inquired into on cross-examination, at the discretion of the court, if they are probative of a witness's truthfulness or untruthfulness. Rule 608(b) applies because the government did not introduce extrinsic evidence about these other acts; all it did was ask Davis about them.[10]

Inquiry into the first two incidents was clearly proper, because they went to Davis's truthfulness. See Deary v. City of Gloucester, 9 F.3d 191 (1st Cir. 1993) (questions about an incident in which a police officer-witness had been disciplined for untruthfulness were appropriate under Rule 608(b)). Inquiry into the third incident, involving the prostitute, does not appear to be probative of truthfulness and therefore it should not have been permitted on cross-examination, unless the government explains to the District

_____

10. A few courts have allowed cross-examination about other bad acts under Rule 404(b) to challenge credibility, though we think that the correct view is that such questions are allowable under Rule 608. See, e.g., United States v. Wimberly, 60 F.3d 281, 285 (7th Cir. 1995) (allowing questions about other acts of molestation to challenge the defendant's credibility under Rule 404(b)); United States v. Chevalier, 1 F.3d 581, 583-84 (7th Cir. 1993) (same for bank fraud in tax fraud trial; court invoked Rule 404(b) but cited only Rule 608(b) cases).

Court why it was probative of credibility rather than of a
tendency to do bad acts.

V. Conclusion

We will reverse Davis's convictions for obstruction of
justice, conspiracy to obstruct justice, and use of a
telephone in aid of racketeering for insufficiency of the
evidence. Because we conclude that Davis was entitled to
an intoxication instruction, we will vacate his conviction on
two counts of witness tampering and remand those counts
to the District Court for further proceedings consistent with
this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit